### ARVID RICHARD ANDERSON v. DAVID W. FLORENCE.

181 N. W. (2d) 873.

October 23, 1970—No. 41823.

*Richards, Montgomery, Cobb & Bassford* and *Charles A. Bassford,* for appellant.

*Robins, Davis & Lyons, Harding A. Orren, James A. Karigan,* and *Burton G. Weisberg,* for respondent.

Rogosheske, Justice.

This appeal from a pretrial order pursuant to leave granted by this court concerns one of the most difficult problems encountered in the application of our Rules of Civil Procedure govern-

ing pretrial discovery to professional malpractice actions.[1] Although the scope of the problem is much broader, the narrow question presented by this appeal is whether Rules 26.02[2] and 43.02[3] governing the scope of pretrial discovery and the cross-examination of an adverse party, authorize the trial court to compel defendant physician, when qualified as an expert witness, to answer questions calling for his expert medical opinion. We hold that they do and affirm the order of the trial court compelling defendant to answer the interrogatories propounded by plaintiff.

The facts and procedural background of the case have been agreed upon by the parties. Defendant is a duly qualified and licensed physician and surgeon specializing in orthopedic surgery. On December 31, 1965, plaintiff was attempting to replace fallen Christmas lights along the eaves of his home when he fell from the roof and was injured. About 25 minutes later he was

---

[1] Numerous authors have commented on the difficult analytical questions involved in the permissible scope of discovery of the opinion of adverse experts. Those questions are further complicated when the defendant himself is asked to testify as an expert. On obtaining the opinion of adverse experts, see, e. g., 1 Louisell & Williams, Medical Malpractice, par. 10.11; 4 Moore, Federal Practice (2 ed.) pars. 26.01[18], 26.66. On obtaining such an opinion from the adverse party himself, see Annotation, 88 A. L. R. (2d) 1186.

[2] Rule 26.02 provides in part: "* * * [T]he witness may be examined regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action * * *. It is not ground for objection that the testimony will be inadmissible at the trial if the testimony sought appears reasonably calculated to lead to the discovery of admissible evidence. The production or inspection * * * of any writing that reflects an attorney's mental impressions, conclusions, opinions, or legal theories, or, except as provided in Rule 35, the conclusions of an expert, shall not be required."

[3] Rule 43.02 provides in part: "* * * A party may call an adverse party * * * and interrogate him by leading questions and contradict and impeach him on material matters in all respects as if he had been called by the adverse party."

admitted to North Memorial Hospital in Robbinsdale for emergency treatment of what was found to be a compound, comminuted fracture of both bones of his lower left leg above the ankle. Defendant performed surgery in an effort to reduce the fractures and otherwise attended plaintiff professionally at North Memorial Hospital until January 4, 1966. On that morning, at his own request, plaintiff was transferred by ambulance to the Veterans Administration Hospital in Minneapolis, where, shortly after his arrival, his left leg was amputated below the knee. Plaintiff brought this action alleging that the loss of his leg was a result of defendant's negligent care and treatment, which defendant specifically denies.

During discovery proceedings, plaintiff submitted five interrogatories designed to elicit defendant's expert medical opinion:

"1. Assuming a compound fracture of the left distal tibia of the sort you found upon examination of plaintiff Arvid Richard Anderson on December 31, 1965, and assuming the surgical procedure you performed on him, describe the usual and customary procedures followed by surgeons in the Minneapolis area in connection with antibiotic therapy and infection control in relation to the surgery and during the first four post operative days.

"2. State whether or not you followed the afore described procedures and, if not, state the respects in which you varied from the said procedures.

"3. On the basis of the facts assumed in Interrogatory No. 1 above, what is the medical significance of a noxious odor emanating from the cast approximately three or four days post operatively?

"4. Describe the usual and customary procedures followed by orthopedic surgeons in the Minneapolis area in the situation referred to above when a noxious odor is detected emanating from the cast three or four days post operatively?

"5. State whether or not the answers to the foregoing questions would be different if it were known that the patient had a circulatory problem in the leg involved."

This form of pretrial discovery rather than that of oral deposition was chosen by prearrangement of counsel to accommodate defendant physician and to accomplish plaintiff's announced purpose of laying a foundation for obtaining a reconsideration of our rule, enunciated in Ericksen v. Wilson, 266 Minn. 401, 123 N. W. (2d) 687, and Hoffman v. Naslund, 274 Minn. 521, 144 N. W. (2d) 580, which prohibits cross-examining a defendant physician in a medical malpractice case by questions designed to elicit his expert medical opinion. Upon defense counsel's objections and instruction to defendant not to answer any of the questions, plaintiff submitted a motion to compel answers. The trial court, acknowledging that he was ruling contrary to the Ericksen and Hoffman decisions, filed an order requiring defendant to answer the interrogatories. His decision incorporated a comprehensive memorandum in which he concludes that this court, upon reconsideration, is likely to change the rule of Ericksen and Hoffman, essentially because the decisions relied upon in Ericksen have since been overruled in an almost unanimous shift of authority.

In Hoffman we reaffirmed the holding of Ericksen that—

"* * * in medical malpractice actions a plaintiff will not be permitted under the guise of cross-examination under the rules to go so far as to compel expert testimony from the defendant to prove a charge of malpractice without properly calling other medical witnesses." 274 Minn. 525, 144 N. W. (2d) 585.

Our decisions did not undertake to express the arguments or reasons supporting the rule but simply relied upon other jurisdictions which had previously reached the same conclusion. Osborn v. Carey, 24 Idaho 158, 132 P. 967; Hunder v. Rindlaub, 61 N. D. 389, 237 N. W. 915; Forthofer v. Arnold, 60 Ohio App. 436, 21 N. E. (2d) 869; Wiley v. Wharton, 68 Ohio App. 345, 41 N. E. (2d) 255; Hull v. Plume, 131 N. J. L. 511, 37 A. (2d) 53; McDermott v. Manhattan Eye Hospital, 16 App. Div. (2d) 374, 228 N. Y. S. (2d) 143. As the trial court notes in his memorandum,

at this time every one of these jurisdictions, except possibly New Jersey, has ruled contrary to their prior holdings.

The cases of Ericksen and Hoffman concerned examination of defendant *at trial* under the adverse-witness rule. Here, the question presented concerns *discovery* before trial, involving both the adverse-witness rule and the rule governing the scope of discovery. To some extent, the policy considerations in each situation differ, and this case might therefore be distinguished from the earlier cases. However, as plaintiff concedes, adherence to the holding in Ericksen would necessarily require reversal of the trial court's order. This is so because of the interaction of our rules. Rule 26.03, dealing with discovery, provides that "[e]xamination and cross-examination of witnesses may proceed *as permitted at the trial* under the provisions of Rule 43.02," authorizing cross-examination of an adverse party at trial. (Italics supplied.) Thus, what is beyond the scope of trial examination under the adverse-witness rule is also beyond the scope of comparable examination during discovery. Consequently, while this case could arguably be distinguished from Ericksen and Hoffman, our holding in effect overrules those decisions.

The trial court exhaustively and accurately noted that since Ericksen, other jurisdictions have reversed or ruled contrary to the cases cited as support in Ericksen. Most of the newer cases concern the same issue decided in Ericksen, i. e., the permissible scope of adverse examination at trial. Lawless v. Calaway, 24 Cal. (2d) 81, 147 P. (2d) 604; State, Use of Miles v. Brainin, 224 Md. 156, 167 A. (2d) 117; Iverson v. Lancaster (N. D.) 158 N. W. (2d) 507; McDermott v. Manhattan Eye Hospital, 15 N. Y. (2d) 20, 255 N. Y. S. (2d) 65, 203 N. E. (2d) 469; Oleksiw v. Weidener, 2 Ohio St. (2d) 147, 207 N. E. (2d) 375; Shurpit v. Brah, 30 Wis. (2d) 388, 141 N. W. (2d) 266; Giacobazzi v. Fetzer, 6 Mich. App. 308, 149 N. W. (2d) 222; Walker v. Distler, 78 Idaho 38, 296 P. (2d) 452; Frazier v. Hurd, 6 Mich. App. 317, 149 N. W. (2d) 226. A few courts have been faced with the question confronting us, i. e., the permissible scope of adverse examination

during the discovery. Rogotzki v. Schept, 91 N. J. Super. 135, 219 A. (2d) 426; Decker v. Pohlidal, 22 Pa. D. & C. (2d) 631; Kennelly v. St. Mary's Hospital, 52 Misc. (2d) 352, 275 N. Y. S. (2d) 597.

Most of these decisions were based solely on the interpretation and application of adverse-witness rule or statute, with only occasional mention of discovery rules. Since our problem is one of discovery, it is necessarily analyzed in light of the basic philosophy underlying modern discovery rules that "a lawsuit should be an intensive search for the truth, not a game to be determined in outcome by considerations of tactics and surprise."[4] Because of the widespread acceptance of the soundness of this policy as well as the proven efficiency of the various discovery techniques embodied in the rules to achieve this objective, it has long been commonplace for the parties, through counsel, to open their files and freely exchange information about the case and to diligently cooperate in the pretrial ascertainment of not only the facts but also other information concerning any matter not privileged which may have a bearing on the actual or potential issues to be litigated.

It is thus understandable that our rules governing the scope of discovery do not prohibit eliciting expert opinion testimony from an adverse party. It is true, as defendant asserts, that Rule 26.02 excepts from discovery "production or inspection * * * of any writing that reflects an attorney's mental impressions, conclusions, opinions, or legal theories, or, except as provided in Rule 35, *the conclusions of an expert.*" (Italics supplied.) However, the pertinent part of this limitation applies only to con-

---

[4] Louisell, *Discovery and Pre-Trial Under the Minnesota Rules,* 36 Minn. L. Rev. 633, 639. See, also, Hickman v. Taylor, 329 U. S. 495, 67 S. Ct. 385, 91 L. ed. 451; 4 Moore, Federal Practice (2 ed.) par. 26.02[2]; 2A Barron & Holtzoff, Federal Practice and Procedure (Rules ed.) § 641; Louisell, *Discovery Today,* 45 Calif. L. Rev. 486; 2 Youngquist & Blacik, Minnesota Rules Practice, Hetland, Interpretive Commentaries, 1968 pocket part, p. 7.

clusions of an expert and only to such conclusions when they are *in writing*. Leininger v. Swadner, 279 Minn. 251, 156 N. W. (2d) 254. Discovery of an adverse party's expert conclusions not in writing surely was not intended to be precluded by the rule.

When the purpose and objective of Rule 26.02 is kept in mind, it must be accepted that any limitation on the scope of discovery engrafted on discovery procedures by interpretation must rest on sound policy grounds. In Leininger v. Swadner, *supra,* dealing with plaintiff's right to discover the opinion and conclusions of defendant's independently-engaged expert, we recognized that perhaps the strongest argument, if not the only one, supporting a denial of discovery is that of unfairness in the sense that to permit examination of one paid by and under control of the adverse party would amount to taking property without payment of compensation. But this argument loses its force when applied to the expert opinion of an adverse party himself. In that situation, the concept of fairness embodied in the discovery rules as well as in the adverse-witness rule clearly comprehends that the parties to an action who are eyewitnesses to and participants in the event giving rise to the action fully disclose to each other all matters relevant to the issues in dispute and available to them without regard to how the information was acquired, whether by special training or rendering professional service. If it is conceivable that peculiar circumstances can make eliciting expert testimony from a defendant physician unfair in the property sense, such unfairness could be eliminated by an allowance of expert-witness fees in accordance with Minn. St. 357.25.[5] This statute provides for, but does not require, an allowance of such fees, for we long ago observed with respect to that statute that "no witness can refuse to answer a question on the ground that his answer will be what is known as expert evidence; and this,

---

[5] Minn. St. 357.25 states: "The judge of any court of record, before whom any witness is summoned or sworn and examined as an expert in any profession or calling, may, in his discretion, allow such fees or compensation as, in his judgment, may be just and reasonable."

whether he has been summoned or paid as an expert witness or not." State v. Teipner, 36 Minn. 535, 537, 32 N. W. 678, 679. Moreover, it is generally accepted that, absent a statute such as ours, a defendant physician or any physician having personal knowledge of the relevant facts has no privilege to refuse to testify without the payment of expert-witness fees. 1 Louisell & Williams, Medical Malpractice, par. 10.11.

One concluding observation as to Rule 26.02 should be made. In defining the scope of examination during discovery proceedings, the rule provides that a witness may be examined "regarding *any matter*" (italics supplied) relevant to the subject matter of the pending action, even though inadmissible at trial, if the testimony sought "appears reasonably calculated to lead to the discovery of admissible evidence." The scope of discovery thus is not confined only to "admissible facts" but extends to nonfactual matters as well. This understanding of the rule is especially applicable to a medical malpractice action where it is difficult to distinguish between fact and opinion, as is often experienced by trial judges endeavoring to adhere to the rule prohibiting eliciting expert-opinion testimony from a defendant physician. See, e. g., Hoffman v. Naslund, *supra.* Indeed, the safest course for a trial judge under that rule is to limit the examination of a defendant physician to what he did and how he did it and to sustain all objections to questions which inquire of his knowledge of the proper medical standard or ask for his explanation of the failure to effect a satisfactory medical result or to prevent complications. This difficulty of ruling on the admissibility of testimony should be eliminated and can be when, considering the ultimate issues of a malpractice case, it is recognized, as in McDermott v. Manhattan Eye Hospital, 15 N. Y. (2d) 20, 27, 255 N. Y. S. (2d) 65, 71, 203 N. E. (2d) 469, 473:

"* * * [T]he doctor's knowledge of the proper medical practice and his possible awareness of his deviation from that standard in the particular case are, in a real sense, as much matters

of 'fact' as are the diagnosis and examination he made or the treatment upon which he settled."

The medical malpractice action is a unique and difficult type of lawsuit. It is usually more bitter and contentious than an ordinary negligence suit and its effect on litigants is often profound. Both the litigants and the public have important interests in the processing and outcome of malpractice suits. Physicians should not be plagued with defending unmeritorious lawsuits, but a wronged patient is entitled to pursue a warranted claim. The public interest is best served when malpractice is effectively curbed without discouraging reasonable innovations in medicine or adversely affecting the availability or expense of medical services.

Not only are medical malpractice actions unique; the defendant physician, as this case demonstrates, is in a unique position. He is called upon to fill three possible roles during discovery and at trial, namely, those of an adverse party, an eyewitness, and an expert witness. As the adverse party, he, like plaintiff, can be required to testify both before and at trial as fully on material matters as any witness in any civil action. Rules 26.03 and 43.02; Pfefferkorn v. Seefield, 66 Minn. 223, 68 N. W. 1072. Although it infrequently occurs, proof of plaintiff's whole case can rest on his adversary's testimony. Boyea v. Besch, 144 Minn. 254, 174 N. W. 894. Unlike the ordinary witness, an adverse party need not be subpoenaed to obligate him to attend a deposition; mere notice as provided in Rule 30.01 suffices. Furthermore, the adverse-witness rule provides that examination of a defendant deposed orally or by written interrogatories or called as witness under that rule is adverse, thus permitting use of leading questions and impeachment. Rule 43.02.

A defendant physician in a medical malpractice suit is also an eyewitness and often the only person with firsthand knowledge of critical evidence. As such, he can be required to testify to facts coming under his observation during performance of professional duties. Le Mere v. McHale, 30 Minn. 410, 15 N. W.

682; Anderson v. Minneapolis, St. P. & S. S. M. Ry. Co. 103
Minn. 184, 114 N. W. 744. The scope of discovery examination
of defendant and witness alike is broad; relevancy rather than
admissibility in evidence is the test. Rules 26.02 and 33. One of
the only exceptions to the rule that relevant matter is subject
to discovery and disclosure at trial has been the rule that in medi-
cal malpractice actions the defendant cannot be compelled to tes-
tify as an expert witness.

That position is the third role defendant is asked to assume.
To testify as an expert, a witness, whether a nonparty or an ad-
verse party, must be qualified, i. e., found competent in the spe-
cial skill or knowledge about which he is to testify. According
to the agreed statement of facts in this case, defendant is a
"duly qualified and licensed physician and surgeon in the State
of Minnesota, specializing in the field of orthopedic surgery."
This stipulation compels us to accept defendant as qualified to
answer the questions propounded despite the implication that
plaintiff, by instituting this action, is challenging his expertise.

Our discussion to this point has concentrated on consideration
of discovery policy. Having recognized that in this situation both
discovery rules and the adverse-witness rule are controlling, we
must also examine the policy considerations underlying the lat-
ter. Although some decisions denying the right to elicit expert
testimony from an adverse party include no reasoning to justify
the result, a few supporting arguments can be discerned from
other opinions. 52 Minn. L. Rev. 698, 706. Some courts have con-
sidered it unfair and contrary to the purpose of the adverse-
witness rule to allow one party to prove his case by the opposing
party's expert testimony. In one sense this argument is akin to
the concept that a party to a lawsuit should establish his case in
a "sporting" manner. But in malpractice actions the argument
assumes a slightly different and more specific quality: It is un-
reasonable and unfair to allow a plaintiff in a malpractice action
to elicit expert testimony from the defendant whose expertise
he is attempting to condemn. In general, the unfairness argu-

ment has been discredited in recent cases. The courts assert that the question of unfairness to individuals should not be controlling, since the inquiry is directed to one who has been a participant in the occurrence and withholding relevant testimony by litigants obstructs the administration of justice. Oleksiw v. Weidener, 2 Ohio St. (2d) 147, 207 N. E. (2d) 375; Giacobazzi v. Fetzer, 6 Mich. App. 308, 149 N. W. (2d) 222. Furthermore, it is now generally recognized that the purpose of the adverse-party-witness rule "is to permit the production in each case of all pertinent and relevant evidence that is available from the parties to the action." State, Use of Miles v. Brainin, 224 Md. 156, 161, 167 A. (2d) 117, 119; McDermott v. Manhattan Eye Hospital, 15 N. Y. (2d) 20, 27, 255 N. Y. S. (2d) 65, 71, 203 N. E. (2d) 469, 473. As the New York court recognized, the usual and customary medical procedures and whether defendant deviated therefrom are certainly "pertinent and relevant" to a malpractice action. It should be emphasized that a defendant physician's general expertise is not on trial or in issue; the question to be resolved is whether his conduct and medical judgment in a particular case amounted to a professional mistake. Seen in this light, it is not unfair to allow the opposing party to elicit the malpractice defendant's expert opinion.

Another reason arguably justifying our result in Ericksen is that a qualified individual has in his expert opinion a property right of which he would be deprived if compelled to offer expert testimony under the adverse-witness rule. However, as already suggested, this argument appears to be inapplicable when the expert is the adverse party. Any unfairness which might result could be alleviated in the manner described above.

In short, no policy considerations underlying the adverse-witness rule conflict with our decision. This conclusion applies with even more force when the rule is applied to pretrial discovery. We have repeatedly recognized that our discovery rules are remedial and must be construed liberally. Litigants are now permitted and encouraged to uncover all relevant matters before

trial, even though evidence procured might be inadmissible at trial. The policy of the adverse-witness rule does not contradict but indeed blends with that philosophy. This conclusion finds support in recent decisions of other jurisdictions. Rogotzki v. Schept, 91 N. J. Super. 135, 219 A. (2d) 426; Decker v. Pohlidal, 22 Pa. D. & C. (2d) 631; Kennelly v. St. Mary's Hospital, 52 Misc. (2d) 352, 275 N. Y. S. (2d) 597.

Although defendant acknowledges a shift in authority elsewhere, he expresses understandable concern as to the effect our decision may have on the integrity of the medical profession. He urges us not to follow the newer cases but to take the lead in adhering to a rule which in his view has contributed to our medical heritage of high standards of medical care by affording justifiable protection to the physicians of this medically-oriented state. His principal argument is that abandoning that rule will encourage frivolous malpractice suits, since plaintiff no longer need seek out or produce at least one independent medical expert to evaluate his case and testify in support of his claim in order to avoid a nonsuit.

We share defendant's appreciation of the medical profession in Minnesota. We bow to no one in our respect and esteem for the generally high quality of medical services available in this state and the preeminent standing of its medical profession in the nation. We would not change procedural rules if to do so would provoke unjustified malpractice cases or expose physicians to unnecessary involvement in expensive and time-consuming litigation initiated primarily to placate disappointed patients or to squeeze out small settlements. The undesirable consequences of such acts are clear: An already overburdened profession would have less time to meet the ever increasing demand for medical services and less inclination to further medical science; medical-practice insurance rates, and consequently medical fees charged patients, health insurance costs, and government health care programs, would increase.

However, we are not persuaded that our decision will have the

effect feared by defendant. There is no evidence that in all of the states which have changed the rule—and we are apparently the only one that has not done so—there has been an avalanche of spurious medical malpractice actions.[6] In fact, the contrary is more likely to be true. Precluding full discovery of defendant physician's explanation for an unanticipated result or complication, couched in expert opinion and conclusionary form, spawns more suits and trials than it prevents. Except in an obvious case of medical mistake, it would seem that neither the patient nor his lawyer can properly evaluate a claim without knowing the treating physician's explanation of what had occurred. Moreover, absent a rule sanctioning incomplete disclosure (which we suspect is often employed by defense counsel as a trial tactic to the distress of the physician, albeit in his interest), a professional duty to disclose the information necessary for his patient to comprehend what had occurred is inherent in the physician-patient relationship and, in fact, contemplated by the code of medical ethics adopted by the profession.[7] That information, when scrutinized by counsel and tested by cross-examination, must be regarded as one of the most efficient means of screening

---

[6] We can find no studies of malpractice litigation or studies analyzing the causes of medical malpractice claims which lend any support to defendant's apprehension. Rather, the suggested causes are numerous and complex, with emphasis on the obvious fact that such claims and suits have their prime origin in medical care, not in legal procedures, for, while reasonable men may differ as to whether an unfortunate result flowing from a physician's care or treatment constitutes negligence, it cannot be disputed that, absent such result, the question would never arise. See, 1 Louisell & Williams, Medical Malpractice, cc. 4 and 5; Subcommittee on Executive Reorganization of Senate Committee on Government Operations, 91st Cong. 1st Sess., *Medical Malpractice: The Patient versus the Physician (Comm. Print 1969)*.

[7] A.M.A., Principles of Medical Ethics, § 1, provides: "The principal objective of the medical profession is to render service to humanity with full respect for the dignity of man. Physicians should merit the confidence of patients entrusted to their care, rendering to each a full measure of service and devotion."

out unwarranted claims and terminating litigation. It may also be noted that without full disclosure by defendant physician, the likelihood of obtaining reliable, independent, expert evaluation is severely handicapped.

A second reason that the dangers feared by defendant are more apparent than real is found in the character of the legal profession. No lawyer worthy of his privileged status can, without violating the Code of Professional Responsibility of the American Bar Association, which we have recently adopted, represent a person in a spurious lawsuit.[8] Every experienced lawyer knows that it is completely unprofessional and unjust to institute a suit for medical malpractice without an independent medical evaluation of the care and treatment rendered by the defendant doctor unless the result alone supports an inference of medical negligence. Moreover, in spite of the medical profession's hostility toward the justification for the usual contingent-fee arrangement between plaintiff and his lawyer, and its misunderstanding of the arrangement, the cost to the lawyer of prosecuting to trial unfounded and weak malpractice claims is a most effective deterrent, for the fee is contingent on winning and the lawyer knows that 33 percent of nothing is nothing.

It should also be emphasized that we do not intend by our decision to hold that in every malpractice suit the plaintiff can make a prima facie showing merely by cross-examining the defendant physician without other independent expert testimony. It is entirely too optimistic to believe that a plaintiff will obtain favorable medical-opinion testimony from a defendant physician. Furthermore, if the plaintiff is permitted to go to the jury in a close case of liability on the defendant physician's arguable admissions of negligence alone, the hazard of permitting the jury

---

[8] Disciplinary Rule 2-109 of the code provides in part: "(A) A lawyer shall not accept employment on behalf of a person if he knows or it is obvious that such person wishes to:

"(1)   Bring a legal action * * * merely for the purpose of harassing or maliciously injuring any person."

to pass upon the requisite community medical standard without any independent expert medical guidance is encountered.[9]

It must be borne in mind that the fundamental reason for our decision is to ensure, so far as possible, that a patient's just claim will not fail for want of available expert medical testimony. It has been observed in the exhaustive treatise of Louisell and Williams on medical malpractice that—

"* * * from the patient's viewpoint, the failure of a just case more rankles the disappointed litigant and causes a sense of injustice to fester—particularly where the failure results from his inability to get evidence which his common sense tells him should have been available—than almost any other failure of judicial administration in civil cases." Par. 1.02.

The public's vital interest in the just and efficient disposition of medical malpractice claims might best be advanced by a method beyond the province of our role and function as a reviewing court. The interrelated problems of spurious claims and the failure of just claims could be ameliorated if an interprofessional screening committee were established in this state to which could be referred all questionable malpractice claims.[10] Such committees, we understand, are functioning successfully in Montana and Arizona and perhaps other localities. If the committee determines that no malpractice occurred, the lawyer is honorbound to refuse to institute the action; if the committee determines that malpractice may have occurred, it undertakes to aid the plaintiff in obtaining necessary independent medical testimony.

In answering the narrow question presented, we are mindful that our decision necessarily effects a change in the permissible scope of adverse examination at trial and that it applies to all professional malpractice actions. We do not, however, decide the question of the scope of interrogation of a nondefendant physi-

---

[9] Comment, 34 U.M.K.C. L. Rev. 416.

[10] See, Mulder v. Parke Davis & Co. 288 Minn. 332, 181 N. W. (2d) 882.

cian having knowledge of relevant facts who is responding to a subpoena in discovery proceedings. Neither have we been required to decide what limitations exist pertinent to the payment of expert-witness fees, nor the scope of cross-examination where defendant physician is not qualified as a medical-expert witness. Our decision should be read as limited to the narrow issue presented, and in so far as our decisions in the Ericksen and Hoffman cases are inconsistent with that holding, they are overruled.

Affirmed.

KNUTSON, CHIEF JUSTICE (dissenting).

I cannot agree with this decision. We have had occasion during recent years to thoroughly consider this question on two occasions: Ericksen v. Wilson, 266 Minn. 401, 123 N. W. (2d) 687 (1963), and Hoffman v. Naslund, 274 Minn. 521, 144 N. W. (2d) 580 (1966). In both cases the court unanimously rejected the position now taken by the majority. The result of the majority opinion can lead to nothing but harassment of doctors in an effort to compel them to establish liability against themselves. I think our existing law furnishes necessary protection to a medical profession which is outstanding and recognized as such throughout the country. I think we should adhere to our former decisions on this subject.

NELSON, JUSTICE (dissenting).

I join in the dissent of Mr. Chief Justice Knutson.

MR. JUSTICE KELLY, not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.