**Clinton E. SMITH, as trustee for the heirs at law of Diane R. Smith, decedent, and Clinton E. Smith, as trustee for the heirs at law of Baby Girl Smith, decedent, Appellant,**

v.

**Dr. William David KNOWLES, Respondent.**

**No. 48963.**

Supreme Court of Minnesota.

May 18, 1979.

Rischmiller, Wasche & Knippel and Robert Wm. Rischmiller, Minneapolis, for appellant.

Gislason, Dosland, Malecki, Gislason & Halvorson, S. P. Gislason, and C. Allen Dosland, New Ulm, for respondent.

Heard before KELLY, SCOTT, and WAHL, JJ., and considered and decided by the court en banc.

SCOTT, Justice.

This is an appeal by plaintiff, Clinton E. Smith, as trustee for the heirs of Diane Smith (his wife) and Baby Girl Smith (his stillborn child), from an order of the district court in Blue Earth County dismissing plaintiff's wrongful death actions against defendant, Dr. William David Knowles.

The dismissals were granted, upon motion of defendant at the close of plaintiff's case, on the ground that the plaintiff failed to offer sufficient expert evidence for the jury to consider his claims of negligence and causation. We affirm.

The actions giving rise to this appeal arose from the deaths of Diane Smith and her unborn child. Both mother and child died as a result of toxemia of pregnancy, or "eclampsia."[1] These actions were commenced against Diane's attending physician, Dr. Knowles. Essentially, plaintiff claims that Dr. Knowles was negligent in failing to make a timely diagnosis of Diane's pre-eclampsia and that he was further negligent in his treatment of that condition once it was diagnosed.

Diane and Clinton Smith were married in 1968. They had one son, Bryan, born December 29, 1971. Diane first saw Dr. Knowles, who is engaged in a general family practice in Mankato, in August of 1972. The doctor graduated from the University of Minnesota Medical School in 1968 and, other than his year of internship, has had no formal postgraduate training. Diane Smith consulted him on September 18, 1973, at which time he diagnosed her second pregnancy. From September until her death in February, 1974, she saw Dr. Knowles at one-month intervals.

Clinton Smith testified at trial that his wife's pregnancy differed markedly from her first one. He indicated that beginning in November she experienced headaches, heartburn, blurred vision, swelling in her legs and ankles and some vomiting. He related that these symptoms continued into December and that Diane took aspirin and antacid tablets throughout this period to alleviate these symptoms. Plaintiff further testified that his wife continued to suffer from nausea, blurred vision, headaches, chest pains and swelling through January and that these symptoms intensified in early February. Plaintiff established that on February 6 and 7 Diane was too sick to go to work. The defense, however, showed that Diane was able to return to work on Friday, February 8, and was able to accompany her husband to a card club on the night of February 11, 1974.

At trial, plaintiff called several of Diane's coworkers, friends and relatives who like Mr. Smith testified that they had observed these problems during Diane's pregnancy and that Diane Smith told them she had reported these symptoms to her doctor. The defense, in turn, called three of Diane's friends who testified that they had not heard her complain of any sickness during her pregnancy. Further, Dr. Knowles' receptionist and nurse both testified that they did not recall Diane calling the doctor and complaining of any illness.

At trial, Dr. Knowles testified[2] that a pregnant woman with pre-eclampsia would experience persistent headaches, massive edema of the hands and face, chest pain and blurred vision. He further testified, however, that prior to February 13, he did not note any of the danger signals of pre-eclampsia in his examinations of Diane Smith. Rather, Dr. Knowles testified that, as of her January 16 office visit, Diane did not have pre-eclampsia. He based his conclusion on the facts that on January 16 (as on all prior visits), Diane's blood pressure was normal and "her urine was normal for protein."

On February 13, 1974, Diane Smith awoke sick, but decided to go to work. After arriving at work, she called Dr. Knowles' office and was told to come in. Dr. Knowles testified that she complained of headache, nausea, vomiting and blurred vision. His examination of her revealed

1. Eclampsia is an extremely serious complication of pregnancy. It is the full development of a condition known as pre-eclamptic toxemia or pre-eclampsia. Pre-eclampsia is a complication arising in the latter half of pregnancy; it involves an increase in blood pressure, albumin in the urine, and the retention of fluid in the tissues. When pre-eclamptic patients develop convulsions, they are then designated as having eclampsia. 5B Lawyers Medical Cyclopedia, § 37.15a.

2. Because the trial court granted the dismissal shortly after plaintiff rested, Dr. Knowles only testified on cross-examination for plaintiff.

that she had edema, that her blood pressure was significantly elevated and that her urine was thick and brownish and had a plus-three albumin level. He testified that he then diagnosed pre-eclampsia and admitted her to the hospital. Mr. Smith, however, testified that his wife called him at work and asked him to come and pick her up at Dr. Knowles' office. He testified that when he arrived, Diane was crying and Dr. Knowles told him to take her home for "rest and medication." Mr. Smith claims Dr. Knowles admitted Diane to the hospital only after he urged the doctor to do so.

Diane was admitted to the hospital at approximately 11:45 a. m. Prior to her arrival, Dr. Knowles called the hospital and verbally ordered that, at the nurse's discretion, Diane be given Tylenol with Codeine. That medication was never given. Dr. Knowles next spoke to hospital personnel at 1 p. m. He testified that Diane had not yet begun to convulse and that he ordered that she be given 10 milliliters of magnesium sulphate intramuscularly.[3] Dr. Knowles testified that, either while he was on the phone, or immediately after he hung up, but in either event after he had prescribed the magnesium sulphate, Diane suffered her first convulsion. The nurses' notes reflect only that both Dr. Knowles' second call and the convulsion happened at approximately 1 p. m. It is undisputed, however, that Diane did not receive any magnesium sulphate until after her first convulsion.

Dr. Knowles arrived at the hospital between 1:30 and 2 p. m. and, upon the recommendation of Dr. Eisenbeis (an internist), ordered that Diane receive additional magnesium sulphate intravenously. At 3:20, again on Dr. Eisenbeis' recommendation, Dr. Knowles ordered more magnesium sulphate for Diane. He assumed that all the magnesium sulphate ordered was administered. Diane was responsive after her first convulsion and complained of a headache, but lost consciousness around 2:30. At 6:40 p. m., Dr. Knowles called Dr. Howard, an

obstetrician, and asked for his assistance. Late that evening, after the doctors could no longer hear fetal heart tones, Dr. Howard performed a Caesarean section and delivered a stillborn baby girl. Diane's condition continued to deteriorate following the operation. On February 19, the doctors administered an encephalogram and determined that Diane's brain had ceased functioning. Mr. Smith gave his permission for the doctors to discontinue artificial means of life support, and Diane expired.

At trial, plaintiff sought to show that Dr. Knowles was negligent in both his diagnosis and treatment of Diane's condition. The trial court concluded that plaintiff failed to present sufficient competent medical testimony to allow the case to go to the jury, and thus granted defendant's motion to dismiss. Therefore, the question before us is whether, in light of the testimony presented, the trial court erred in dismissing these actions. Treating the dismissal as a directed verdict, this court must give effect to the established rule that a motion for a directed verdict, " * * * accepts the view of the *entire* evidence most favorable to the adverse party and admits the credibility * * of the evidence in his favor and all reasonable inferences to be drawn therefrom * *." *Hanson v. Homeland Insurance Co. of America,* 232 Minn. 403, 405, 45 N.W.2d 637, 638 (1951) (emphasis original, footnotes omitted).

■ Clearly, expert testimony is crucial to plaintiff's claims. To establish a prima facie case in an action such as this, the plaintiff here must introduce expert testimony as to both the standard of care and the defendant doctor's departure from that standard. See e.g., *Cornfeldt v. Tongen,* 262 N.W.2d 684 (Minn.1977); *Lhotka v. Larson,* 307 Minn. 121, 238 N.W.2d 870 (1976); *Todd v. Eitel Hospital,* 306 Minn. 254, 237 N.W.2d 357 (1975). Moreover, plaintiff's claims required expert testimony to show that Dr. Knowles' action or inaction was a direct cause of the decedents' deaths.

---

**3.** Magnesium sulphate is recognized as being effective in the treatment of pre-eclampsia. It lowers blood pressure, increases urinary output and prevents convulsions without otherwise depressing the central nervous system.

*Silver v. Redleaf,* 292 Minn. 463, 194 N.W.2d 271 (1972).

Here, plaintiff called no independent medical witnesses. Instead, he chose to prove his case through his` cross-examination of Dr. Knowles[4] and the introduction of excerpts from several recognized medical treatises.[5] The trial court carefully reviewed this evidence and concluded that it was legally insufficient. We agree.

At trial, plaintiff called Dr. Knowles for cross-examination and asked him a series of hypothetical questions. Dr. Knowles was most forthright and candid in his answers. For example, he was asked:

> "Q Now, is it the standard of care and was it the standard of care back in late 1973 and '74 that where you have a condition of persistent headaches, blurred vision, fatigue, significant epigastric pain, and developing edema of the feet, that the physician managing the woman with those symptoms should suspect pre-eclampsia as a cause?"

He answered ` yes. He further testified that, when pre-eclampsia is suspected, it should be treated immediately and that immediate treatment increases the likelihood of a cure without the materialization of any adverse complications. His testimony was corroborated, to a large extent, by excerpts from several learned treatises.[6] Giving this general evidence the benefit of all legitimate inferences, we conclude that it was, at best, minimally sufficient to establish the requisite standard of care. Never was any specific expert testimony presented which tended to show that Dr. Knowles departed from this standard.

Even more troubling, however, is the lack of expert testimony on the causation elements of plaintiff's claims. Here, as in *Silver v. Redleaf, supra,* plaintiff had the burden to prove, by expert testimony, that, "* * * it was more probable that death resulted from some negligence for which defendant was responsible than from something for which he was not responsible." 292 Minn. 465, 194 N.W.2d 273. (Citations omitted). Such proof is absent from this case. Instead, the record would have compelled the jury to speculate as to whether earlier diagnosis or different treatment would have resulted in a cure. The trial court could not permit this, and thus had no alternative but to.grant defendant's motion for a dismissal. In light of our disposition of this case, we need not reach the other issues raised by the briefs.

Affirmed.

SHERAN, C. J., and OTIS, J., took no part in the consideration or decision of this case.

4. Our prior holdings have established that the plaintiff in a medical malpractice action may prove his claim by expert testimony elicited solely from the defendant doctor. *Larson v. Belzer Clinic,* 292 Minn. 301, 195 N.W.2d 416 (1972); *Anderson v. Florence,* 288 Minn. 351, 181 N.W.2d 873 (1970).

5. Since the adoption of Rule 803(18), Minnesota Rules of Evidence, once proper foundation is established, learned treatises may be used as substantive evidence.

6. Although it is unclear from the record whether these were admitted into evidence during the trial, the trial court admitted them into evidence for the purpose of ruling upon defendant's motion to dismiss. Thus these treatises are properly before us on appeal. Plaintiff, in his brief, relies heavily upon the following excerpt from Williams on Obstetrics: "Since eclampsia is preceded in most cases by premonitory signs and symptoms, its prophylaxis is in many ways more important than its cure and is identical with the treatment of preeclampsia. Indeed, a major aim in treating the preeclampsia is to prevent convulsions. The necessity of regular and frequent blood pressure measurements thus becomes clear, as well as the importance of detection of rapid gain of weight and of proteinuria, and the immediate institution of appropriate dietary and medical treatment as soon as the earliest signs and symptoms appear. By the employment of these precautionary measures and by prompt termination of pregnancy in those cases that do not improve or that become progressively worse under treatment, the frequency of eclampsia will be greatly diminished and many lives will be saved. Prophylaxis, while valuable, is not invariably successful * * *."