Imogene **WALTON**, Trustee of the next of kin of James Walton, Appellant,

v.

Richard H. **JONES**, Respondent.

No. 49293.

Supreme Court of Minnesota.

Nov. 9, 1979.

Stewart R. Perry, Minneapolis, for appellant.

Meagher, Geer, Markham, Anderson, Adamson, Flaskamp & Brennan and O. C. Adamson II, Minneapolis, for respondent.

Heard before OTIS, PETERSON, and KELLY, JJ., and considered and decided by the court en banc.

SCOTT, Justice.

This medical malpractice action was commenced by the plaintiff, Imogene Walton, against the defendant, Dr. Richard H. Jones, in the Hennepin County District Court. The trial court granted defendant's motion for a directed verdict on the ground that plaintiff had failed to introduce sufficient evidence to create a jury issue on the causal connection between defendant's actions or omissions and the decedent's death. Plaintiff appeals from the trial court's denial of her post-trial motions.

Plaintiff brought this action for money damages for the wrongful death of her husband, James Walton, alleging that his death resulted from the medical malpractice of defendant.

Mr. Walton fractured his ankle on December 6, 1972. He was taken to the emergency room of Deaconess Hospital, where surgery was performed and a cast was applied to his ankle by defendant, Dr. Jones. Mr. Walton's history showed pulmonary diseases, including tuberculosis, asthma, and possible emboli (blood clots). Defendant treated him in light of this history. On December 7, while still hospitalized, Mr. Walton suffered from an upset stomach. Defendant called in Dr. William D. Nesset, an internist, to examine him, and Mr. Walton's chest X-ray was repeated. Mr. Walton was released from the hospital on December 16. At defendant's instruction, he returned to the hospital on December 29 to have his cast changed by defendant. At this time, everything appeared satisfactory, and defendant instructed Mr. Walton to come in again to have his cast checked and changed on or about January 12, 1973. Defendant claims he set January 12 as a definite date, but plaintiff claims they were only told to return in approximately two weeks. Mr. Walton did not return at this time.

Shortly after his cast was changed, Mr. Walton began complaining to his wife that his cast felt tight. Plaintiff testified that for a period of two weeks thereafter she tried to reach defendant by telephone to relay Mr. Walton's complaints but was unable to speak to him personally and that messages she left at his office and at the hospital for defendant to call her were not returned. Defendant denied that plaintiff ever left any messages.

Plaintiff alleges that after she had tried for several weeks to reach defendant, Mr. Walton succeeded in contacting defendant about January 20 and told him that his leg was hurting and that it hurt to breathe. Plaintiff testified that the doctor said he would make an appointment for Mr. Walton at the Veterans Hospital, and that plaintiff should take Mr. Walton there in an ambulance. However, when plaintiff then called the Veterans Hospital there was no appointment for Mr. Walton to be admitted, and consequently she did not take him to the hospital. Defendant alleges that this conversation took place on January 30, that he specifically told plaintiff he would call the hospital and that he arranged for Mr. Walton's admission. Plaintiff testified that she renewed her efforts to reach defendant after this episode, and that she and Mr. Walton did talk to defendant on January 30, at which time defendant told Mr. Walton to have plaintiff break down the edges of the cast with pliers. Defendant denies this.

Mr. Walton died on February 2, 1973, from pulmonary emboli (blood clots obstructing the arteries to the lungs). Dr. John Coe, chief of pathology at the Hennepin County Medical Center and medical examiner for Hennepin County, was the pathologist in charge of the autopsy per-

formed on Mr. Walton. He testified that such blood clots often form when a person is immobile and can break off into the bloodstream and travel to the lungs, obstructing blood vessels there. The clots in Mr. Walton's lungs were of varying age up to several weeks old, according to Dr. Coe. Although Dr. Coe testified that the clots often form in extremities, frequently at the site of a fracture, no determination had been made as to the origin of the clots and no examination of either leg was made.

Testimony from Dr. Coe, the defendant, and Dr. Nesset, although the testimony of the latter was later stricken, indicated that drugs are available which may arrest the formation of new blood clots. However, no testimony was introduced indicating that treatment of Mr. Walton with anticoagulant drugs would have reduced the likelihood of his death.

After plaintiff rested her case, the trial court considered the defendant's motion for a directed verdict on the grounds that plaintiff had not established by expert testimony what the standard of care in the community was, that said standard had been violated, and that Mr. Walton's pulmonary embolism was due to the fracture and could have been prevented by a particular method of treatment. Plaintiff then requested and was granted permission to reopen her case to include the expert testimony of Dr. Nesset, the treating internist. Defendant objected to Dr. Nesset's expert testimony on the grounds that plaintiff had rested her case and that, according to a pretrial order signed by the referee, plaintiff's counsel had informed defendant's counsel that he would not use any experts except Dr. Coe. At the conclusion of Dr. Nesset's testimony, the trial court ordered it stricken because of the pretrial order. The trial judge added that even if he had allowed Dr. Nesset's testimony to stand he still would have granted defendant's motion for a directed verdict. The judge also refused to allow plaintiff's counsel to recall defendant at this point for further cross examination as to his expert opinions.

The issues to be decided in this case are as follows:

(1) Did the trial court act within its discretionary authority in striking Dr. Nesset's testimony?

(2) Did the trial court act within its discretionary authority in refusing to allow plaintiff to reopen her case to recall defendant for further cross-examination?

(3) Was the trial court correct in directing a verdict for defendant at the close of plaintiff's presentation of evidence?

1. As noted above, the trial court heard Dr. Nesset's testimony and then ordered it stricken on the basis of a pretrial order signed by the referee. According to the pretrial order, plaintiff's counsel informed counsel for the defendant that he would not use any experts other than Dr. Coe. Furthermore, the parties agreed that if plaintiff's counsel did decide to use other experts, he would notify the defense counsel not later than February 1, 1977. In the event of failure to inform defense counsel, it would be assumed that no other experts would be called by plaintiff.

■ In general, the exclusion of expert testimony lies within the sound discretion of the trial court and will not be disturbed on appeal absent a showing of abuse of discretion. *Dunshee v. Douglas*, 255 N.W.2d 42 (Minn.1977); *Hestad v. Pennsylvania Life Ins. Co.*, 295 Minn. 306, 204 N.W.2d 433 (1973). The reopening of a party's case to allow additional testimony also lies within the sound discretion of the trial court. *King v. Larsen*, 306 Minn. 546, 235 N.W.2d 620 (1975); *Hamilton v. Killian*, 296 Minn. 256, 207 N.W.2d 703 (1973).

■ Plaintiff maintains that the trial court should have done something less drastic than excluding Dr. Nesset's testimony, under these circumstances. The trial court did hear Dr. Nesset's testimony and concluded that it would not remedy the defects in plaintiff's case. In light of this, the striking of Dr. Nesset's testimony was not an abuse of discretion.

■ 2. Plaintiff's counsel examined defendant extensively concerning both de-

fendant's treatment of Mr. Walton and his expert opinions about standards of care and the causes and treatment of pulmonary emboli. Plaintiff's counsel attempted unsuccessfully to elicit blanket statements from defendant concerning standards of care and whether treatment of the decedent with drugs to prevent further emboli would have saved his life. In the trial court's opinion, permitting plaintiff to recall defendant to ask him similar questions about his expert opinions would have been fruitless and inappropriate. In light of the fact that the examination of defendant would probably not cover any new ground, it was not an abuse of the trial court's discretion to refuse to allow plaintiff to reopen her case and recall defendant.

■ 3. In reviewing a trial court's order of a directed verdict, this court must make an independent judgment about the appropriateness of the directed verdict. In *J. N. Sullivan & Assoc. v. F. D. Chapman Const. Co.*, 304 Minn. 334, 231 N.W.2d 87 (1975), we stated:

> It is well settled that a motion for a directed verdict pursuant to Rule 50, Rules of Civil Procedure, presents only a question of law for the trial court regarding the sufficiency of the evidence to present a fact question for the jury to decide. The test to be applied by the lower court *and this court on review* is that the motion should be granted only in those unequivocal cases where (1) in the light of the evidence as a whole, it would clearly be the duty of the trial court to set aside a contrary verdict as being manifestly against the entire evidence, or where (2) it would be contrary to the law applicable to the case.

304 Minn. 336, 231 N.W.2d 89 (emphasis added; footnotes omitted). And in considering a motion for a directed verdict, this court must accept as true all of the evidence favorable to the adverse party and all reasonable inferences which can be drawn from the evidence. *Hanson v. Homeland Insurance Co. of America*, 232 Minn. 403, 45 N.W.2d 637 (1951); *Smith v. Knowles*, 281 N.W.2d 653 (Minn.1979).

■ To establish a prima facie case of medical malpractice, a plaintiff must introduce expert testimony on the standard of care required from a physician under the circumstances and on defendant's departure from that standard. *Cornfeldt v. Tongen*, 262 N.W.2d 684 (Minn.1977); *Todd v. Eitel Hospital*, 306 Minn. 254, 237 N.W.2d 357 (1975). Furthermore, plaintiff must present expert testimony showing that defendant's action or inaction was a direct cause of the decedent's death. *Smith v. Knowles, supra*; *Silver v. Redleaf*, 292 Minn. 463, 194 N.W.2d 271 (1972).

In the instant case, the trial court expressed doubt as to the sufficiency of plaintiff's expert testimony on the issues of standard of care and defendant's departure from it, but based its directed verdict on the insufficiency of expert medical testimony on the issue of causation. Thus, it is the causation issue with which this court must be concerned; that is, whether the decedent's fatal pulmonary emboli were due to his broken ankle and whether accepted medical treatment of the emboli, once they came to the attention of a physician exercising due care in his treatment of the decedent, would have prevented decedent's death.

In several cases, this court has discussed the requisite showing of causation by expert testimony to establish a prima facie case of medical malpractice. For example, in the recent case of *Smith v. Knowles, supra*, this court concluded:

> Here, as in *Silver v. Redleaf, supra*, plaintiff had the burden to prove, by expert testimony, that " * * * it was more probable that death resulted from some negligence for which defendant was responsible than from something for which he was not responsible." 292 Minn. 465, 194 N.W.2d 273 [citations omitted]. Such proof is absent from this case. Instead, the record would have compelled the jury to speculate as to whether earlier diagnosis or different treatment would have resulted in a cure. The trial court could not permit this, and thus had no alternative but to grant defendant's motion for a dismissal.

281 N.W.2d 656. And in *Schulz v. Feigal*, 273 Minn. 470, 142 N.W.2d 84 (1966), we stated:

> It is well recognized that the rule that a verdict in a malpractice case cannot be based on speculation or conjecture as to cause does not necessarily require that the plaintiff prove causation by direct and positive evidence which excludes every other possible hypothesis as to the cause of the injuries. Generally, it is held that, after a fair preponderance of evidence discloses facts and circumstances proving a reasonable probability that the defendant's negligence or want of skill was the proximate cause of the injury, the plaintiff has supported his burden of proof sufficiently to justify a verdict in his behalf.

273 Minn. 476, 142 N.W.2d 89 (citations omitted).

In *Walstad v. University of Minnesota Hospitals*, 442 F.2d 634 (8th Cir. 1971), the court of appeals summed up Minnesota law thus:

> The plaintiffs of course also have the burden of proof on the issue of the fact of causation and must introduce evidence which affords a reasonable basis for one to conclude that it is more likely than not that defendant's conduct was a substantial factor in bringing about the result. "In negligence cases and especially in malpractice cases, proof of causal connection must be something more than consistent with the plaintiff's theory of how the claimed injury was caused." * * * Proof of causation cannot rest on conjecture and the mere possibility of such causation is not enough to sustain the plaintiffs' burden of proof. * * * Furthermore, when the causal relation issue is not one within the common knowledge of laymen, causation in fact cannot be determined without expert testimony.

442 F.2d 639 (citations omitted).

In the instant case, plaintiff's expert medical witnesses were Dr. Coe, the pathologist, and the defendant, Dr. Jones. Dr. Coe testified that the facts of the case, including the treatment given to decedent's broken ankle, were consistent with the autopsy findings of death from pulmonary emboli but "not diagnostic." He also stated in general terms that drugs are available which can be used to prevent the formation of clots. Dr. Coe testified that these clots frequently form in the legs, and that when there is a fracture in one leg they tend to form in the fractured leg. However, no determination was made by Dr. Coe during the autopsy as to the origin of the clot in decedent's lungs. Thus, although the autopsy findings were consistent with plaintiff's theory of the case, Dr. Coe did not give an expert opinion on the source of the clots in this case, and he said nothing about whether treatment of decedent with drugs after his symptoms became obvious might have prevented his death.

Defendant testified that drugs are available which tend to prevent the formation of new clots. He also testified that decedent's shortness of breath and leg pains were consistent with pulmonary emboli, but not necessarily present. He did not testify, however, that treatment of decedent with anticoagulant drugs would have prevented decedent's death.

Viewing all of the evidence in the light most favorable to plaintiff and drawing all reasonable inferences in plaintiff's favor, it would appear that the evidence could be *consistent* with plaintiff's theory that defendant's negligent treatment of Mr. Walton resulted in his death and that his death would not have occurred if he had been given proper medical treatment. However, it is well settled in Minnesota that expert testimony in a medical malpractice case must be more than consistent with plaintiff's theory of causation; the expert testimony must demonstrate a reasonable *probability* that defendant's negligence was the proximate cause of the injury. Testimony must show that it was more likely that death occurred from defendant's negligence than from anything else. Here, no expert testimony indicated that the blood clots were probably due to decedent's fractured ankle; rather, Dr. Coe testified that no determination of the source of the

clots had been made. And no expert testimony whatsoever was introduced from which it could reasonably be inferred that anticoagulant treatment begun after Mr. Walton's emboli had been diagnosed by a doctor exercising due care would probably have saved Mr. Walton's life. None of the experts gave an opinion on the probabilities in this case. Therefore, there was no expert testimony from which a jury could infer, under the legal standards for medical malpractice, that defendant's negligence caused Mr. Walton's death.

Affirmed.

OTIS, J., took no part in the consideration or decision of this case.