Helen WILLIAMS, as Trustee for the
Heirs of Teddy Miller Vetaw,
Deceased, Appellant,

v.

Deborah WADSWORTH, Robert
A. Ulstrom, Respondents,

The University of Minnesota Hospitals
and Clinics, Defendant.

No. C3–92–550.

Court of Appeals of Minnesota.

Sept. 1, 1992.

Review Granted Oct. 28, 1992.

David J. Moskal, Sharon L. Van Dyck, Schwebel, Goetz, Sieben & Moskal, Minneapolis, for appellant.

Kathryn H. Davis, Bassford, Heckt, Lockhart, Truesdell & Briggs, Minneapolis, for respondent Wadsworth.

Daniel J. Bresnahan, Bloomington, for respondent Ulstrom.

Considered and decided by DAVIES, P.J., and LANSING and NORTON, JJ.

## OPINION

NORTON, Judge.

Appellant challenges summary judgment in favor of respondent physicians dismissing her claims for negligent treatment and negligent non-disclosure of the risk. We reverse.

## FACTS

Appellant Helen Williams brought this action as trustee for the heirs of her late son, Teddy Miller Vetaw. Vetaw was sixteen years old when he died on November 4, 1988 from complications of a lymphangiogram, a diagnostic procedure ordered by respondent, Dr. Robert Ulstrom. Williams' signature as parent on the informed consent form was obtained by respondent, Dr. Deborah Wadsworth.

Vetaw was born with complex cardiac abnormalities and underwent three heart surgeries by age ten. Those surgeries could not completely correct Vetaw's abnormal cardio-pulmonary circulatory pattern. Shortly after the last heart surgery, Vetaw also underwent thoracic duct ligation, which interrupted the normal thoracic lymph channel in order to reduce the load on Vetaw's already overworked cardio-pulmonary circulation. Vetaw was relatively healthy until age fifteen, when he developed edema and diarrhea, associated with protein-losing enteropathy. Vetaw became malnourished and developed blood electrolyte imbalances and related problems.

In October 1988, Vetaw was admitted to the University of Minnesota Hospitals. The stated treatment goals were to reverse Vetaw's malnutrition, diagnose and correct, if possible, its causes, and evaluate and prepare Vetaw for further heart surgery. Because intravenous feeding was not sufficient to overcome his problems, a hyperalimentation feeding catheter was recommended. Vetaw also underwent a heart catheterization procedure, apparently to verify circulatory anatomy.

Vetaw was released from the hospital to celebrate his sixteenth birthday, October 25, 1988, and on the next day a hyperalimentation catheter was surgically installed. A lymphangiogram was scheduled, the chart indicates, to "check for any abnormalities in lymph—obstructions, etc." and to "assess lymph leakage prior to any heart surgery" planned for the "next week possi-

bly." Dr. Wadsworth's chart notes dated October 26, 1988 indicate the lymphangiogram is to "evaluate lymph node anatomy." The consent form which Dr. Wadsworth then drafted for Williams' signature indicates the lymphangiogram is to evaluate lymph nodes in the pelvis, abdomen and chest. The form states that Dr. Wadsworth discussed with Williams the nature, purpose and intended outcome of the procedure, the risks and possible complications of the procedure, reasonable alternative procedures and the prognosis if the procedure is refused. Williams testified that her son did not want to undergo the procedure but that she was told the procedure was fairly routine. She signed the form at 5:30 that evening and the procedure was begun the next morning.

The lymphangiogram began normally, but when the dye being injected through lymph channels in Vetaw's feet reached his pelvic/abdominal region, it rapidly moved past the expected path and concentrated in his left lung, causing a pulmonary embolism. The procedure was immediately interrupted and Vetaw was admitted to the intensive care unit, in a coma, with respiratory distress. By the next morning it was evident that brain injury had occurred; a CAT scan confirmed central nervous system and brain damage. Repeated tests showed no improvement and Vetaw never regained consciousness. Early on November 4, Vetaw developed ventricular arrhythmias and, despite all efforts, Vetaw's heart eventually failed. He was pronounced dead later that morning.

Williams commenced this action against Dr. Wadsworth and Dr. Ulstrom claiming negligent treatment by Dr. Ulstrom and negligent nondisclosure by both Dr. Ulstrom and Dr. Wadsworth. After a trial deposition of Williams' expert witness, cardiologist Dr. Richard Friedlander, respondents moved for summary judgment claiming that Dr. Friedlander was not qualified to render an expert opinion regarding the applicable standard of care or their deviation from that standard. The trial court granted summary judgment dismissing Williams' claims, holding that Dr. Friedlander had disqualified himself from rendering

an expert opinion because of his answer to a question regarding current uses for lymphangiogram and because he had himself discontinued use of the procedure. The trial court held that Dr. Friedlander was not competent to render an expert opinion on informed consent "for the same reasons." The respondent doctors argued that because Dr. Friedlander was not competent to render an expert opinion, Williams had failed to produce prima facie evidence on either theory of recovery. The trial court agreed, and granted summary judgment dismissing Williams' claims. This appeal followed.

## ISSUES

I. Did the trial court err in granting summary judgment holding that Dr. Friedlander was disqualified from rendering an expert opinion regarding the lymphangiogram ordered by Dr. Ulstrom?

II. Did the trial court err in granting summary judgment holding that Dr. Friedlander was not qualified to render an expert opinion regarding whether Dr. Wadsworth obtained informed consent?

## ANALYSIS

In review of summary judgment, this court must determine whether there are any genuine issues of material fact and whether the trial court erred in its application of the law. *Betlach v. Wayzata Condominium*, 281 N.W.2d 328, 330 (Minn. 1979). Both the trial court and the appellate court must view the evidence in the light most favorable to the nonmoving party and resolve all doubts or factual inferences against the moving party. *Nord v. Herreid*, 305 N.W.2d 337, 339 (Minn.1981).

## I.

■ To maintain a medical malpractice action, a plaintiff will be required to offer an expert's opinion as to the standard of care and the defendant doctor's departure from that standard. *Cornfeldt v. Tongen*, 262 N.W.2d 684, 692 (Minn.1977) (*Cornfeldt I*). A medical expert is required to have *both* sufficient scientific knowledge of

the practice involved as well as some practical experience with the subject matter of the offered testimony. *Id.* Williams' medical expert, Dr. Friedlander, is a cardiologist who has ordered approximately 20 lymphangiograms. Dr. Friedlander testified that he had not ordered a lymphangiogram in "several years" and that they were supplanted for most purposes by the development of other, less invasive diagnostic procedures such as the CAT scan and the MRI.

■ After he explained the procedure, Dr. Friedlander was asked:

Q: Given what you have just stated, that in recent years the use of a lymphangiogram has decreased because of the development of other tests for the purposes of looking at lymph anatomy, what would be the purpose of a lymphangiogram today?

He answered:

A: I think I am getting far afield from my specialty. I am not comfortable answering that question. I don't really know what the current indication would be.

Based upon this exchange, the trial court ruled that the witness had disqualified himself from rendering an expert opinion about the lymphangiogram performed upon Vetaw. Review of the testimony as a whole, however, demonstrates that Dr. Friedlander was willing and able to testify, within his "field of expertise," as to both the indications and contraindications for lymphangiogram. Dr. Friedlander testified that, in his opinion, lymphangiogram was probably contraindicated in a patient with the cardiopulmonary problems presented by the decedent. Dr. Friedlander did not disqualify himself from testifying as an expert about the material issue of fact in this case. Rather, he freely gave his opinion that this test would provide no information not already contained in the medical history chart, or available through MRI or a CAT scan, and that Vetaw's thoracic duct ligation indicated that a lymphangiogram would not proceed normally.

■ Opinion evidence is not restricted to the testimony of the expert best qualified to give an opinion but may be offered by a person who, in his profession, deals with the subject at hand. The value of such evidence is to be tested by cross-examination and ultimately determined by the jury. *Christy v. Saliterman,* 288 Minn. 144, 167, 179 N.W.2d 288, 303 (1970). Dr. Friedlander is an expert in cardiology and is familiar with the problems of patients like Vetaw. Dr. Friedlander has practical experience ordering lymphangiograms. We do not believe that only a doctor with the same precise specialty and background as Dr. Ulstrom, who has also treated a patient presenting the same unique problems as Vetaw, would be competent to testify to the standard of care required.

The trial court also held, based upon the above question and answer, that Dr. Friedlander did not possess the requisite knowledge and experience to testify because he had not recently performed the procedure. A physician with this much experience in the same part of the body is competent to testify concerning the procedure; the fact that he has not recently used the procedure goes to the weight given his testimony, not to its admissibility. *McCormack v. Lindberg,* 352 N.W.2d 30, 35 (Minn.App.1984). We cannot uphold the trial court's imposition of a standard more strict than that which the law requires. It is for the jury to decide the weight to be given such testimony. *Id.*

■ Moreover, the evidence raises questions of fact regarding the purposes for which the procedure was performed on Vetaw, and of whether this procedure is, in whole or in part, obsolete for those purposes. The very nature of these issues makes it inappropriate to demand that Williams present an expert who continues to perform this procedure for the same purposes on patients with similar problems. It is clear that Dr. Ulstrom and Dr. Friedlander disagree regarding the current validity of lymphangiogram. This disagreement represents a factual dispute for which

summary resolution is inappropriate. Minn.R.Civ.P. 56.03.

## II.

Williams argues the trial court also erred in deciding that Dr. Friedlander was incompetent to testify regarding the issue of informed consent. After ruling that Dr. Friedlander disqualified himself from giving an opinion regarding lymphangiogram, the trial court concluded that, "for the same reasons," Dr. Friedlander was incompetent to render an expert opinion regarding informed consent. Williams argues that both Dr. Wadsworth, then a second-year medical 'resident,' and Dr. Ulstrom negligently failed to inform her of known risks associated with the procedure.

■ In order to maintain an action for negligent nondisclosure, Williams must demonstrate that she was not properly informed of a risk inhering in the treatment, that this undisclosed risk materialized in harm and that consent to the treatment would not have been secured if the risk were disclosed. *Cornfeldt I,* 262 N.W.2d at 699. Although Dr. Ulstrom ordered the test, Dr. Wadsworth was required to obtain Williams' informed consent. Dr. Wadsworth testified that she does not specifically recall that meeting, but her notes indicate that the purpose of the lymphangiogram was "to evaluate lymph node anatomy." On the consent form, Dr. Wadsworth wrote that the purpose of the test was "to evaluate lymph nodes in the pelvis, abdomen and chest."

Dr. Ulstrom testified that the purpose of the test was to look for a way to reroute or repair the lymph drainage system. Other doctors involved in Vetaw's care apparently believed that the lymphangiogram would be ordered to assess the current levels of lymph node leakage after thoracic duct ligation or to check for abnormalities in the lymphatic system prior to any further heart surgery. Dr. Ulstrom testified that, "If we had wanted to look at the lymph nodes then we could have done a non-invasive procedure such as a CAT scan or an MRI." Williams argues that because Dr. Wadsworth did not even understand the purposes and intended outcome of the test, she could hardly have obtained the informed consent required. The consent sheet Dr. Wadsworth discussed with Williams and which both signed included as an alternative the option to refuse the procedure. Dr. Wadsworth admits that she did not discuss this alternative with Williams.

■ Dr. Ulstrom testified that he discussed the purposes for this test with Williams. Williams testified that he did not, that only Dr. Wadsworth discussed the lymphangiogram with her. Dr. Ulstrom testified that he never told either Vetaw or Williams that Vetaw might die as a result of this procedure or that the procedure presented any specific dangers. The role of expert testimony in establishing a *prima facie* case of negligent nondisclosure is to show that a risk in fact exists, that it is accepted medical practice to know of that risk, and that it is more probable than not that the undisclosed risk did materialize in harm. *Reinhardt v. Colton,* 337 N.W.2d 88, 96 (Minn.1983). A conflict in such evidence does not support summary judgment but rather, creates an issue for the jury to decide. *Id.* Clearly, this conflict in the testimony implicates a genuine issue of material fact which must be resolved by a jury.

Dr. Friedlander testified that, based on the medical record, there was sufficient evidence of the danger of complications that these risks should have been discussed with the patient. Dr. Friedlander testified that he had ordered this test for his patients approximately twenty times. He also testified that he had obtained informed consent "countless" times, first as a medical resident, and later as a physician. To hold that a board-certified cardiologist such as Dr. Friedlander is not qualified to render an expert opinion regarding the informed consent allegedly obtained by a second-year resident is error. If respondents are to argue that the medical resident, Dr. Wadsworth, was qualified to obtain an informed consent, then they should not be heard to argue that the experienced cardiologist, Dr. Friedlander, is not qualified to

testify to the standard of care required in so doing.

### DECISION

A board-certified cardiologist with experience ordering lymphangiograms for patients is qualified by both training and experience to render an expert opinion on the standard of care required in ordering a lymphangiogram for a patient with cardiac problems. The expert did not disqualify himself from giving such an opinion by his unwillingness to enumerate current indications for the procedure, and his opinion that this procedure has limited usefulness and was too dangerous to have been ordered for this patient demonstrates the existence of a genuine issue of material fact inappropriate for summary resolution.

A board-certified cardiologist with actual experience ordering the medical procedure in question, and in obtaining "countless" informed consents, is qualified to express an expert opinion regarding the standard of care required of a medical resident in obtaining informed consent for performance of that procedure.

Reversed.