337 N.W.2d 88 (1983)
Jeanne A. REINHARDT, et al., Appellants,
v.
Roger S. COLTON, M.D., et al., Respondents.
No. CX-82-284.
Supreme Court of Minnesota.
July 22, 1983.
*89 Johnson, Sands, Lizee, Fricker & McCloskey, Terence J. McCloskey and Thomas E. Sanner, Minneapolis, Arlo H. Vande Vegte, Long Lake, for appellants.
Geraghty O'Loughlin & Kenney, James W. Kenney and Richard J. Thomas, St. Paul, for respondents.
Considered and decided by the court en banc without oral argument.
AMDAHL, Chief Justice.
This is a medical malpractice action arising from the administration of the drug penicillamine to Jeanne Reinhardt. Mrs. Reinhardt is a 40-year-old woman residing in North St. Paul, Minnesota. She is married to Terras Reinhardt and they have two children, Terri Lynn and Jolene. Mrs. Reinhardt was a part-time clerical employee and homemaker at the time she consulted the defendants-respondents, Dr. Dunham and Dr. Colton, for diagnosis and treatment in August of 1976. Mrs. Reinhardt also participated in church-related activities and athletics. From her use of the penicillamine Mrs. Reinhardt developed aplastic anemia, which is a disease which suppresses one's ability to produce blood.
In late summer of 1976, Mrs. Reinhardt contacted Dr. C.K. Dunham, a St. Paul general practitioner, and presented him with symptoms of rheumatoid arthritis. Dr. Dunham referred Mrs. Reinhardt to Dr. Roger S. Colton, a St. Paul rheumatologist. She was first seen by Dr. Colton in his *90 office in October of 1976. In his examination of Mrs. Reinhardt, Dr. Colton performed a number of tests, including a blood test, and then made a tentative diagnosis of rheumatoid arthritis. Dr. Colton recommended that Mrs. Reinhardt return in 2 or 3 months, and he advised Dr. Dunham of the office visit by letter.
Dr. Colton next saw Mrs. Reinhardt on February 21, 1977. She complained of stiffness in her joints, was seen by a nurse, and underwent additional blood work which confirmed the diagnosis of rheumatoid arthritis. Dr. Colton then examined her, injected cortisone into the stiff and sore joints of her hand, and prescribed the drug penicillamine. He also told her to get blood tests every 7 to 10 days. Dr. Colton wrote to Dr. Dunham the day following Mrs. Reinhardt's second visit, outlining his examination and treatment of Mrs. Reinhardt.
Penicillamine is a drug currently used to treat Wilson's Disease, cystinuria, and rheumatoid arthritis. At the time it was prescribed for Mrs. Reinhardt, penicillamine was approved by the Food and Drug Administration for only Wilson's Disease and cystinuria, and not for rheumatoid arthritis. Penicillamine is a toxic drug with a potential for causing a variety of adverse reactions, including bone marrow suppression (i.e., destruction of certain blood cell making capacities causing, among other things, aplastic anemia). Dr. Colton first used penicillamine in 1975, although the drug had been used with some frequency in England prior to that time.
There was conflicting testimony regarding exactly what was communicated to Mrs. Reinhardt about penicillamine when she was given it on February 21, 1977. Mrs. Reinhardt testified that Dr. Colton told her briefly about penicillamine and and gave her a descriptive handout. She testified that Dr. Colton told her penicillamine was a new drug that had achieved good results, but that he did not tell her that it was not FDA approved for rheumatoid arthritis. She testified that Dr. Colton did say that the blood tests were designed to detect adverse side effects, but that he did not stress, or explain further, the importance of those tests. She testified that Dr. Colton did not tell her the drug could cause aplastic anemia. On the other hand, Dr. Colton testified that he did tell her of the drug's potential to cause aplastic anemia, and that he did emphasize its potentially lethal nature and the consequent importance of the blood tests. Dr. Colton also testified that he did tell Mrs. Reinhardt that the drug had not yet gained FDA approval for the treatment of rheumatoid arthritis. In a letter to Dr. Dunham summarizing his meeting with Mrs. Reinhardt, Dr. Colton indicated that: "We discussed at length that penicillamine can provide benefit in certain individuals," and that "[s]he is aware of the side effects." In any event, Mrs. Reinhardt received a prescription for penicillamine on a p.r.n. basis (i.e., she could refill the prescription on her own), and arrangements were made to have regular (i.e., at 7- to 10-day intervals) blood tests done at Dr. Dunham's office until her next visit to Dr. Colton in April 1977.
Mrs. Reinhardt began taking penicillamine and having blood tests performed at the offices of Dr. Dunham. She never saw Dr. Dunham, and, because they were apparently not abnormal, Dr. Colton did not review the results of these tests.
Mrs. Reinhardt returned to Dr. Colton's office on April 11, 1977. He examined her and increased her dosage of penicillamine to 1 gram per day. Again, Dr. Colton wrote Dr. Dunham regarding this visit, reporting that the penicillamine was suppressing her disease, and encouraging continued blood tests at 10-day intervals. Mrs. Reinhardt continued to take the penicillamine and continued to have her blood checked regularly at Dr. Dunham's office.
Mrs. Reinhardt again returned to Dr. Colton's office on June 29, 1977. She testified that she was "feeling good" in June, but that she was experiencing very heavy bleeding during her menses. She testified that Dr. Colton did not tell her this could be significant, so she did not report it to him. She testified that she wasn't experiencing any pain and that Dr. Colton was very *91 pleased and excited with her progress. Mrs. Reinhardt further testified that Dr. Colton advised her, in response to her plans to visit the family's summer cabin, that her blood tests could now be performed only every 3 to 4 weeks. However, on cross-examination this testimony was impeached by her deposition testimony to the effect that the subject of her visit to the lake cabin didn't arise. In addition, Dr. Colton again wrote Dr. Dunham and again indicated that Mrs. Reinhardt would continue to need blood work done. This letter indicated that the blood work should be done every 2 weeks.
Mrs. Reinhardt did go to the cabin with her family the first week of July 1977. She remained there until about the 19th, returned home, and then resumed her stay at the cabin until the 29th. During this vacation, she experienced bleeding of the gums and cuticles, unusual bruising, and heavy menses. She did not schedule a blood test appointment when she returned home on July 29th, although she did admit that she knew she should do so in accordance with Dr. Colton's instructions. She testified that she did not appreciate the importance of the blood tests, and that she began to think of them like "hair appointments" which could be postponed with little consequence.
Mrs. Reinhardt went back to work in early August 1977. She did not schedule a blood test. On August 22 she noticed bruising on her hands that was "not a regular type of bruising." At the urging of a co-worker, she called Dr. Colton, saw him in his office, and was immediately admitted to the hospital. She had developed aplastic anemia as a result of taking the drug penicillamine.
Dr. Colton ceased treating Mrs. Reinhardt in August 1977. Following her admission to St. John's Hospital in St. Paul, Mrs. Reinhardt was transferred to UCLA Medical Center Hospitals for extensive testing and prolonged hospitalization. She was considered but ultimately rejected as a candidate for a bone marrow transplant. She came home in December of 1977 and was put in isolation because of her extreme susceptibility to disease. Fortunately, after almost 2 years of regular blood transfusions and frequent medical attention, Mrs. Reinhardt went into spontaneous remission from aplastic anemia. She testified to her restrictions at present, the effect of the disease on her emotional and family life, and to over $80,000 in medical expenses.
The Reinhardts proceeded with their cause of action upon two theories: (1) negligence in treatment and (2) negligent nondisclosure of risk. The case was tried in Ramsey County District Court commencing on January 26, 1982. The trial resulted in the grant of a directed verdict against the Reinhardts, but that motion was made and granted at a time when the Reinhardts had really not completed their case-in-chief. Therefore, this appeal is presented in an unusual procedural posture.
The Reinhardts began their case with the testimony of Mrs. Reinhardt and with the testimony of Dr. Colton, who was called as an adverse witness. The Reinhardts then called Dr. Ralph C. Greene as their sole expert witness. After some preliminary testimony regarding educational and occupational background, Dr. Greene was asked a hypothetical question for the purpose of eliciting expert testimony regarding the applicable standard of care. An objection as to foundation was made by counsel for respondents and the trial court sustained the objection. The trial court then excused the jury, and counsel for the Reinhardts made a lengthy offer of proof in an effort to establish foundation for Dr. Greene's testimony. The trial court remained unsatisfied after the completion of the offer of proof, and again expressed its determination that there was insufficient foundation for Dr. Greene to testify competently as to the standard of care owed by Drs. Colton and Dunham to Mrs. Reinhardt.
At that point, a discussion occurred at the bench. The trial court reiterated its view that the testimony of plaintiffs' expert was incompetent, but indicated that it would permit the introduction of the testimony because it believed that this court disfavored *92 the disqualification of a witness for lack of foundation. The trial court stated:
Our Supreme Court has repeatedly recognized the propriety of allowing testimony to go forward even though there is a substantial reason to either direct a verdict or to disqualify someone for lack of foundation so that, if there is an appeal, a retrial may be avoided if the Supreme Court disagrees with the trial court. * * * Consequently, although I do not feel this doctor is qualified to testify in this case, I would allow his testimony to come in, because I can correct the result [by granting a motion under Minn. R.Civ.P. 50.02 for judgment notwithstanding the verdict] if that becomes necessary following trial.
Counsel for the Reinhardts, facing the prospects of a considerably weakened case and an adverse JNOV, was reluctant to continue. In his view, further trial proceedings would be "a present waste of judicial time," and he was concerned with "the practical aspect of my clients and their ability to pay for the litigation, to pay for the litigation twice." The Reinhardts therefore elected not to proceed with the balance of their case (which was to include Dr. Greene's testimony on the standard of care and causation, additional lay witnesses on damages, and expert witnesses on damages). Instead, after conferring with his clients, the Reinhardts' counsel rested and invited a defense motion for a directed verdict. Defense counsel then moved for a directed verdict, and that motion was granted. A timely appeal was taken from the order for a directed verdict.
At the outset, we note some irregular occurrences in this trial, including the trial court's expressed intent and rationale concerning the defendant's foundation objection,[1] and the timing of the successful defense *93 motion for a directed verdict.[2] However, because the dispositive issues can be separately treated, these irregularities are not pivotal to our analysis. The dispositive issues raised in this appeal can be grouped into three categories: (1) issues raised by the trial court's exclusion of plaintiffs' expert's testimony; (2) issues raised by the directed verdict for defendant on the claim of negligence in treatment; and (3) issues raised by the directed verdict for defendants on the claim of negligent nondisclosure of risk.

1. Exclusion of Expert Testimony

The first issue presented is whether the trial court erred in its exclusion of plaintiffs' expert's testimony. In general, the exclusion of expert medical testimony lies within the sound discretion of the trial court, and its ruling will not be reversed unless it is based on an erroneous view of the law or it constitutes an abuse of discretion. E.g., Walton v. Jones, 286 N.W.2d 710, 713 (Minn.1979); Kinning v. Nelson, 281 N.W.2d 849, 854 (Minn.1979).
The competency of a witness to provide expert medical testimony depends upon both the degree of the witness' scientific knowledge and the extent of the witness' practical experience with the matter which is the subject of the offered testimony. These two general requirements have been discussed as follows:
[The medical expert] must have had basic education and professional training as a general foundation for his testimony, but it is a practical knowledge of what is usually and customarily done by physicians under circumstances similar to those which confronted the defendant charged with malpractice that is of controlling importance in determining competency of the expert to testify to the degree of care against which the treatment given is to be measured.
Cornfeldt v. Tongen, 262 N.W.2d 684, 692-93 (Minn.1977) (quoting Pearce v. Linde, 113 Cal.App.2d 627, 629, 248 P.2d 506, 508 (1952)). See also Swanson v. Chatterton, 281 Minn. 129, 136-38, 160 N.W.2d 662, 667-68 (1968).
Unlike the defendants, the record discloses that the plaintiffs' expert, Dr. Greene, was a pathologist and not a clinician. He has never prescribed penicillamine or treated a patient who was on a regimen of the drug, and he admitted that it is not his job to make a diagnosis of rheumatoid arthritis. Dr. Greene first became aware of the drug in 1977 or 1978, but did not then have any detailed knowledge of its effects. The first time Dr. Greene saw a package insert relating to penicillamine was in 1981, when he began gathering information in preparation for his testimony in this action. *94 Upon this record, the trial court found that Dr. Greene lacked the necessary practical experience regarding the use of penicillamine in treating rheumatoid arthritis in 1977. We conclude that that evidentiary ruling was not an abuse of discretion.
Appellants cite Cornfeldt v. Tongen, 262 N.W.2d 684 (Minn.1977) (Cornfeldt I) for the proposition that it was an abuse of discretion to rule that Dr. Greene's expert opinions lacked foundation. As in the case at bar, Cornfeldt I involved both a claim for negligent treatment and a claim for negligent nondisclosure of risk, as well as an issue regarding the propriety of the expert opinion testimony of a pathologist. Appellants in Cornfeldt I attempted, at trial, to offer testimony of a pathologist that it was a deviation from medical standards for the anesthesiologist, surgeon, and surgical resident to have proceeded as they did. The trial court excluded the pathologist's testimony that in giving general anesthesia the anesthesiologist deviated from accepted medical practice. In upholding this ruling we explained: "[The pathologist] had had little training in anesthesiology * * *. Furthermore, his occupational experience * * * was limited to discussions with * * * anesthesiologists * * * and meetings of his pathological society. The trial judge thus might reasonably have concluded that [the pathologist] lacked the expertise to give an opinion [that the anesthesiologist's treatment deviated] from accepted medical practice * * *." 262 N.W.2d at 694.
Cornfeldt I supports the conclusion that the trial court did not abuse its discretion in determining that Dr. Greene did not demonstrate sufficient relevant occupational experience to testify in this case.[3] The record indicates that Dr. Greene had no experience discussing the suitability of penicillamine treatment with rheumatoid arthritis patients and that he had never used penicillamine to treat such patients. Because the risks attendant to, and the professional standards for, such activities were at issue in this case, the trial court properly exercised its discretion by excluding Dr. Greene's testimony.

2. Negligent Treatment

The second issue presented by this appeal is whether the trial court erred in directing a verdict for defendants against the malpractice action brought by plaintiffs on a theory of negligence in treatment. In reviewing a trial court's order for a directed verdict, this court makes an independent determination of the sufficiency of the evidence to present a fact question for a jury determination. See Walton v. Jones, 286 N.W.2d 710, 714 (Minn.1979). We must accept as true all evidence in a light favorable to the adverse party and affirm the order only "where (1) in the light of the evidence as a whole, it would clearly be the duty of the trial court to set aside a contrary verdict as being manifestly against the entire evidence, or where (2) it would be contrary to the law applicable to the case." Id., quoting J.N. Sullivan & Associates v. F.D. Chapman Construction Co., 304 Minn. 334, 336, 231 N.W.2d 87, 89 (1975) (footnote omitted).
To establish a prima facie case of medical malpractice for negligent treatment, a plaintiff is required to demonstrate "(1) the standard of care recognized by the medical community as applicable to the particular defendant's conduct; (2) that the defendant departed from that standard; * * (3) that the defendant's departure from that standard was a direct cause of [the patient's] injuries;" and (4) damages. Plutshack v. University of Minnesota Hospitals, 316 N.W.2d 1, 5 (Minn.1982). In establishing *95 this prima facie case, the plaintiff must introduce expert testimony to establish the standard of care, the defendant's departure from that standard, and causation, when these issues are not within the common knowledge of laymen. See Smith v. Knowles, 281 N.W.2d 653, 655 (Minn.1979).
Expert testimony is crucial to plaintiffs' claim of negligent treatment. Because we uphold the trial court's exclusion of Dr. Greene's testimony, the plaintiffs are left without an expert of their own. Even absent Dr. Greene's testimony, however, plaintiffs argue that the requisite expert testimony is in the record in the form of defendant Dr. Colton's testimony, who was called by plaintiffs as an adverse witness, and in the form of the drug manufacturer's package insert.
With regard to Dr. Colton's testimony, a plaintiff in a malpractice action may establish his claim with expert testimony elicited solely from the defendant doctor. See, e.g., Anderson v. Florence, 288 Minn. 351, 360-61, 181 N.W.2d 873, 879 (1970). In reviewing Dr. Colton's testimony, it is evident that, although his testimony may be construed to establish the standard of care, it does not constitute the required expert testimony on departure from the standard or on causation. There simply are no direct admissions to that effect by Dr. Colton, nor can they reasonably be inferred from his testimony.
Plaintiffs place considerable reliance upon the drug manufacturer's package insert. In Mulder v. Parke Davis & Co., 288 Minn. 332, 181 N.W.2d 882 (1970), we held that a deviation from a manufacturer's clear and explicit recommendations regarding the use of medication "is prima facie evidence of negligence if there is competent medical testimony that [the] patient's injury or death resulted from the doctor's failure to adhere to the recommendations." 288 Minn. at 340, 181 N.W.2d at 887. Assuming the relevancy of the package insert admitted at trial,[4] Dr. Colton did testify that he only estimated blood platelets whereas the package insert advised "a direct platelet count," and this evidence might be construed as sufficient to satisfy plaintiffs' burden of production on the issue of defendants' breach of an applicable standard of care. However, the Mulder rule still requires expert testimony to establish that the failure to take a direct platelet count was the direct cause of Mrs. Reinhardt's injuries, for this element of causation cannot be established through the introduction of a package insert. Mulder, 288 Minn. at 339, 181 N.W.2d at 887. Again, the only competent expert testimony in the record is that of one of the defendants, Dr. Colton, and his testimony does not satisfy the causation element of plaintiffs' prima facie case. Accordingly, we hold that it was proper for the trial court to direct the verdict in favor of defendants with respect to plaintiffs' claim of negligent treatment.

3. Negligent Nondisclosure of Risk

Remaining is the question of whether plaintiffs met their burden of production with regard to their claim of negligent nondisclosure of risk. A recent case, Plutshack v. University of Minnesota Hospitals, 316 N.W.2d 1 (Minn.1982), contains a partial summary of the basic elements of this cause of action:
We first recognized a cause of action for negligent nondisclosure of a significant risk of treatment in Cornfeldt v. Tongen, 262 N.W.2d 684 (Minn.1977) (Cornfeldt I). A plaintiff must demonstrate *96 (1) a duty on the part of the physician to know of a risk or alternative treatment plan; (2) a duty to disclose the risk or alternative program, which may be established by a showing that a reasonable person in what the physician knows or should have known to be the plaintiff's position would likely attach significance to that risk or alternative in deciding whether to consent to treatment; (3) breach of that duty; (4) causation (the undisclosed risk must materialize in harm); and (5) damages.
316 N.W.2d at 9 (footnote and citation omitted). An additional aspect of the causation element, which was not expressed in the Plutshack court's statement of the elements of this cause of action, is the plaintiff's burden to demonstrate that "a reasonable person in the plaintiff's position would have refused the treatment had he been informed of the undisclosed risk." Cornfeldt I, 262 N.W.2d at 701.
As distinguished from a cause of action for negligent treatment, the role of expert testimony in establishing a prima facie case for negligent nondisclosure of risk is not as prominent. Under Cornfeldt I, expert testimony is necessary to establish that a risk in fact exists, and that it is accepted medical practice to know of that risk. See Cornfeldt I, 262 N.W.2d at 701-02. In addition, the plaintiff must introduce expert testimony to establish that it is more probable than not that the undisclosed risk did materialize in harm. See Cornfeldt v. Tongen, 295 N.W.2d 638, 640-41 (Minn. 1980) (Cornfeldt II). The remaining elements of the cause of action for negligent nondisclosure of risk may be established without the aid of expert testimony.
Applying these principles to the case at bar, and giving the plaintiffs the benefit of the most favorable view of the evidence, we hold that the plaintiffs did introduce sufficient evidence to meet their burden of production in their claim of negligent nondisclosure of risk. Dr. Colton did testify regarding the existence of risks of blood conditions characteristic of aplastic anemia associated with the use of penicillamine that are widely recognized in the medical community. This testimony is supported by precautions on the package inserts. Dr. Colton also testified that it is more probable than not that Mrs. Reinhardt's contraction of aplastic anemia was the result of the maturation of risks associated with the use of penicillamine. Plaintiffs introduced evidence to meet the remaining elements of their prima facie case through the testimony of Mrs. Reinhardt regarding the nature of the risks of which she was made aware, her view of the severity of the allegedly undisclosed risks relative to the benefits of the treatment, and regarding her injuries. Although this testimony may have been impeached by Dr. Colton's testimony regarding what was specifically disclosed, and although the record does contain strong evidence of Mrs. Reinhardt's own negligence in failing to schedule appointments to have her blood checked upon her return from her lake cabin, this conflicting evidence creates jury issues.
Respondent argues that the plaintiffs waived any claim of error and thus any grounds for an appeal as to the directing of a verdict on the plaintiffs' allegations of negligent nondisclosure of risk. A review of the record leads only to the conclusion that everyone, counsel for plaintiff, counsel for defendants and the court, simply: (1) overlooked the independent viability of the negligent nondisclosure of risk cause of action at the time of the consideration of the directed verdict; or (2) assumed that the trial court ruling meant that the plaintiff could continue in any aspect of the trial only by recalling Dr. Greene (i.e., that a directed verdict would issue as to all causes of action, including negligent nondisclosure, if Dr. Greene was not recalled). Thus, there is no sufficient basis for a finding of waiver. Accordingly, we reverse the trial court's grant of a directed verdict with respect to plaintiffs' claim of negligent nondisclosure of risk, and remand to permit plaintiffs a retrial of that claim.
Affirmed in part, reversed in part, and remanded.
NOTES
[1] This is a troublesome evidentiary ruling. On the one hand, the trial court clearly determined the witness to be incompetent. On the other hand, the court indicated that it would permit the introduction of his testimony. The trial court justified this result by stating that this court has "recognized the propriety of allowing testimony to go forward even though there is a substantial lack of foundation so that, if there is an appeal, a retrial may be avoided if the Supreme Court disagrees with the trial court." This court, however, has repeatedly expressed the rule that a trial court has considerable discretion in determining the sufficiency of foundation laid for expert opinion, and that a trial court's exclusion of expert opinion testimony will not be disturbed on appeal absent a showing of an abuse of discretion. See, e.g., Kinning v. Nelson, 281 N.W.2d 849, 854 (Minn. 1979); Busch v. Busch Construction, Inc., 262 N.W.2d 377, 389, 399 (Minn.1977). This standard of review is inconsistent with the trial court's implication that this court reviews such evidentiary rulings de novo, or that this court otherwise enters an order to remand proceedings on the basis of an evidentiary ruling with which this court "disagrees." Rather, our standard of review places the responsibility for evidentiary rulings squarely with the trial judge, and the integrity of this mode of review requires that the trial judge exercise that broad discretion in a principled, but definite, manner.

Similarly, the trial court's expressed intent, in the event of a jury verdict for the Reinhardts, to enter a JNOV on the ground that Dr. Greene's testimony was incompetent is also unsound. Upon a motion for JNOV, a trial judge must consider the inferences which reasonable minds may, as a matter of law, be permitted to draw from competent evidence in the record. See, e.g., Nadeau v. County of Ramsey, 277 N.W.2d 520, 522 (Minn.1979). This rule suggests that the stage of the proceeding at which a motion for JNOV is brought is an inappropriate time at which to effectuate a determination regarding the admissibility of evidence. Determinations regarding the admissibility of evidence should be made at the time the evidence is offered and not through the use of a JNOV after the jury's verdict has been returned, because the latter approach substantially usurps the role of the jury. This is particularly true where, as here, there is competent evidence in the record which, even without the disputed testimony, could constitute a standard of care and thereby provide a proper basis for a jury verdict in plaintiffs' favor.
It appears that the trial court's ruling was made in response to the principle, repeatedly endorsed by appellate courts, which provides that it is generally a more efficient practice for a trial judge to refrain from directing a verdict in doubtful cases in favor of entertaining a motion for JNOV. The rationale for this is set forth in an influential treatise:
If a verdict is directed and the appellate court holds that the evidence was in fact sufficient to go to the jury, an entire new trial must be had. If, on the other hand, the trial court submits the case to the jury, though it thinks the evidence insufficient, final determination of the case is greatly expedited. If the jury agrees with the court's appraisal of the evidence, and returns a verdict for the party who moved for a directed verdict, the case is at an end. If the jury brings in a different verdict, the trial court can grant judgment notwithstanding the verdict. Then if the appellate court holds that the trial court was in error in its appraisal of the evidence, it can reverse and order judgment on the verdict of the jury, without any need for a new trial.
9 C. Wright & A. Miller, Federal Practice & Procedure § 2533 at 586 (1971). While this rationale is sound, it applies to a trial court's judgment regarding the legal sufficiency of the evidence and does not support a decision to defer determinations regarding the admissibility of evidence.
[2] Under the rules, the defense motion may be construed as untimely because plaintiffs' counsel had not put in all of his evidence on damages, which was to include both additional lay and expert testimony. Minn.R.Civ.P. 50.01 provides, in relevant part: "A motion for directed verdict may be made at the close of the evidence offered by an opponent or at the close of all the evidence." (Emphasis added). This statement of the rule has been widely adopted, and it has been construed to preclude the granting of a directed verdict against a party which has not completed the presentation of its evidence. See, e.g., Duplechin v. John Doe, 365 So.2d 53, 54 (La.Ct.App.1978). In the present case, however, although plaintiff's counsel opposed the motion for purposes of the record, he did not oppose it on the ground that he had not rested his case. Rather, plaintiffs' counsel invited the defense motion, and his opposition to that motion consisted solely of arguments regarding the sufficiency of evidence already in the record. In so doing, it is clear that plaintiffs' counsel effectively rested, and that the motion for a directed verdict may therefore be construed as having been brought in a timely fashion.
[3] Appellants argue that the practical experience requirement should be relaxed in cases involving a rare technique. We have not passed upon this proposition, although we have noted that there is foreign authority for it. See Cornfeldt v. Tongen, 262 N.W.2d 684, 693 n. 5 (1977), citing Dow v. Kaiser Foundation, 12 Cal.App.3d 488, 90 Cal.Rptr. 747 (1970). See also Gaston v. Hunter, 121 Ariz. 33, 52, 588 P.2d 326, 345 (Ariz.Ct.App.1978). Even if we were to adopt such a rule, there is little evidence in the record to support appellants' proposition regarding the rarity of the use of penicillamine in treating rheumatoid arthritis in 1977, or to support the inference that there are no rheumatologists available to testify.
[4] In Mulder, we described the type of "package insert" which can serve as a standard of care in this context as one which recommends: "(1) the conditions under which its drug should be prescribed; (2) the disorders it is designed to relieve; (3) the precautionary measures which should be observed; and [which] (4) warns of the dangers which are inherent in its use * *." Mulder, 288 Minn. at 339, 181 N.W.2d 870, 887 (1976). The Food and Drug Administration did not approve the use of penicillamine for rheumatoid arthritis until late 1978, and the package inserts admitted as evidence at trial and applicable to the treatment period (February 1977 to August 1977) do not list rheumatoid arthritis as an approved indication. An issue therefore arises regarding whether the package inserts introduced at trial can serve as a standard of care under the criteria established in Mulder. However, because we hold that the plaintiffs failed to meet their burden of production with regard to the causation element of their cause of action for negligent treatment, we need not address this issue.