**Helen WILLIAMS, as Trustee for the Heirs of Teddy Miller Vetaw, Deceased, Respondent,**

v.

**Deborah WADSWORTH, Robert A. Ulstrom, Petitioners, Appellants,**

**The University of Minnesota Hospitals and Clinics, Defendant.**

**No. C3-92-550.**

Supreme Court of Minnesota.

July 23, 1993.

Kathryn H. Davis, Minneapolis, for Deborah Wadsworth.

Daniel J. Bresnahan, Bloomington, for Robert A. Ulstrom.

Sharon L. Van Dyck, David J. Moskal, Minneapolis, for respondent.

## OPINION

COYNE, Justice.

On the appeal of plaintiff Helen Williams, trustee for the heirs of decedent Teddy Vetaw, the court of appeals reversed the summary judgment entered in favor of defendant-physicians Deborah Wadsworth and Robert Ulstrom, concluding that the trial court erred in determining that the plaintiffs' expert witness was not qualified to offer an expert opinion with regard to the appropriate standard of care for either of the plaintiff's negligent treatment or negligent nondisclosure claims. *Williams v. Wadsworth*, 490 N.W.2d 426 (Minn.App. 1992). We reverse and reinstate the summary judgment.

Fifteen-year-old Teddy Vetaw was admitted to the University of Minnesota Hospital on October 10, 1988 for evaluation and treatment of exudative enteropathy, i.e., chronic diarrhea, the effect of which is to drain plasma protein levels from the body rendering it incapable of preventing edema. The condition was yet another in a lengthy series of complications related to Vetaw's incurable congenital heart defects, including tricuspid atresia, transposition of the great vessels and pulmonary stenosis.

Prior to this hospitalization, Vetaw had undergone several heart surgical procedures on three earlier occasions: when he was 3 months of age, at 4 years of age, and

again when he was 10 years old. Shortly after the last of the surgeries, a modified Fontan anastomosis, Vetaw developed a chylothorax requiring the ligation of his thoracic duct.

By the time of this hospitalization, Vetaw's health had been deteriorating for some time. He was the size of an 11 or 12–year–old child, and showed no signs of puberty although he was 16 years of age. In addition to the symptomatic continuing diarrhea, he suffered from symptomatic hypocalcemia and edema of his face and extremities. His attending physicians at the Hennepin County Medical Center referred him to the University of Minnesota for specialized care under the direction of defendant Dr. Robert Ulstrom, a staff physician specializing in pediatric endocrinology.

Shortly after the referral, Vetaw's physicians commenced intravenous feeding and, when that proved insufficient to provide the necessary nutrition, a central hyperalimentation catheter was inserted. A heart catheterization procedure was also utilized to verify Vetaw's circulatory anatomy; it revealed that Vetaw's right side pressures were mildly elevated and that no intrapulmonary shunting was present. The results of that procedure and pulmonary tests indicated to the treating physicians that further heart surgery was necessary but it was decided that before that surgery was performed, further diagnostic information should be obtained by a lymphangiogram.

As Dr. Ulstrom testified at his deposition, he suspected that Vetaw's "lymphatic system was not the only but the main pathology leading to his exudative enteropathy, his subsequent hypocalcemia and his malnutrition and poor growth." He further testified that a lymphangiogram was indicated because, in his view, it was the "only way of looking at the dynamics of lymph flow up through the abdominal region." Dr. Ulstrom thought that the lymphangiogram would provide the key to unlock the question of what could be done to make Vetaw better, that they might be able to discover whether some repair, revision, or rerouting of the lymph channels would improve the drainage of the lymph.

He did not believe that a less intrusive procedure, such as a CAT scan, was an option and, after the medical team had reviewed the results of the heart catheterization and other tests and discussed the proposed procedure, all agreed that the catheterization did not reveal any shunting that would indicate that Vetaw was at risk for brain embolization and that if the exploratory procedure was performed, an "increased risk [due to Vetaw's medical history] was not recognized, but an increased possible benefit was."

Dr. Ulstrom, according to his own testimony, did not discuss the lymphangiogram procedure with Vetaw but did so with his mother. He did not inform either the plaintiff or her son that the test presented any specific dangers. However, Dr. Deborah Wadsworth, a second-year radiology resident, obtained the plaintiff's signature on the consent form. At her deposition, Dr. Wadsworth testified that she had no other involvement in the treatment or procedures performed on Vetaw and that, while she could not remember her exact conversation with the plaintiff, it was her custom to take about ten to fifteen minutes to explain the procedure involved when obtaining consent forms. She testified that she told the plaintiff that the two main risks from the procedure would be an allergic reaction to the iodine contrast material and a pulmonary edema and that, similarly, it was her custom to inform the plaintiff of the usual risks which attend any kind of surgical procedure, including bleeding and infection. She did not recall whether she informed Williams that there was any possibility of death from the procedure but did explain that the main benefit was that the physicians could obtain the information about the protein-losing enteropathy that could result in medical or surgical intervention. She acknowledged that she did not inform the plaintiff about any possible alternatives to the procedure because she did not believe that there was any other method by which the physicians could obtain comparable information.

The plaintiff testified that Dr. Wadsworth did obtain her consent, informing her that it was "just a simple procedure" and

that she could go home while it was carried out on her son. She was unable to recall talking to Dr. Ulstrom prior to the performance of the lymphangiogram.

The lymphangiogram was performed on October 27, 1988 under general anesthesia. The injected dye entered the lower extremity lymphatic channels appropriately, but when it reached the level of the pelvic lymphatics, it moved very rapidly and began shunting to the venous system at the level of the upper abdomen. The procedure was stopped immediately but the dye already present in the body continued to advance and quickly made its way into Vetaw's left lung, causing a pulmonary embolism. Vetaw was admitted to the intensive care unit and entered into a coma on the morning of October 28. The injected dye eventually traveled to his brain, causing a cerebral embolization. He never regained consciousness and his death occurred one week later, after he developed ventricular arrhythmias and cardiac failure.

The plaintiff initially commenced this action against defendant Dr. Wadsworth, alleging that she had negligently performed the lymphangiogram. The trial court then granted her motion to amend her complaint to state a claim for negligent nondisclosure against Dr. Wadsworth and newly asserted claims of negligent treatment, as well as negligent nondisclosure, against Dr. Ulstrom. The defendants moved for summary judgment after a trial deposition was taken of Williams' expert witness, cardiologist Dr. Richard Friedlander. The trial court granted the motions, directing the entry of summary judgment dismissing all of Williams' claims, concluding that the plaintiff's expert lacked sufficient practical experience with the use of lymphangiograms to qualify as an expert, that he had disqualified himself from testifying about the standards of care relevant to the negligent nondisclosure and negligent treatment claims and that, lacking competent expert testimony, there was no genuine issue of material fact for trial. The court of appeals reversed, concluding that Friedlander was qualified to testify as an expert witness on the standard of care applicable to both claims and had not disqualified himself by his testimony.

■ We find it necessary to comment that, as we examine the trial court's evidentiary rulings as to the qualifications of this expert witness with regard to both the negligent treatment and negligent nondisclosure claims, we do so from the perspective of the abuse of discretion standard. *See Benson v. Northern Gopher Enterprises, Inc.,* 455 N.W.2d 444 (Minn.1990); *Reinhardt v. Colton,* 337 N.W.2d 88 (Minn. 1983). Even if an appellate court would reach a different conclusion with respect to the sufficiency of the foundation, the trial court's decision will not be reversed absent a clear abuse of its broad discretion. *Reinhardt,* 337 N.W.2d at 92, n. 1. An application of that standard is similarly appropriate where the trial court's ruling is predicated upon its determination of incompetency or the disqualification of a witness.

■ It is well-established that to support her negligent care and treatment claim, the plaintiff must offer an expert opinion demonstrating "(1) the standard of care recognized by the medical community as applicable to * * * defendant's conduct, (2) that the defendant in fact departed from that standard, and (3) that the defendant's departure from that standard was a direct cause of [the] injur[y]." *Plutshack v. University of Minnesota Hospitals,* 316 N.W.2d 1, 5 (Minn.1982). In negligent nondisclosure cases expert testimony is necessary to establish that a risk in fact exists and that it is accepted medical practice to know of that risk. *Reinhardt v. Colton,* 337 N.W.2d 88, 96 (Minn.1983). Only then does the issue become "whether the physician *should* have informed the patient of the risks involved in the procedure," and thus, "expert testimony concerning the duty of care in the applicable medical community [becomes] necessary." *Kohoutek v. Hafner,* 383 N.W.2d 295, 299 (Minn. 1986). In addition, expert testimony must be supplied to "establish that it is more probable than not the undisclosed risk did materialize in harm." *Reinhardt v. Colton,* 337 N.W.2d 88, 96 (Minn.1983) (citing

*Cornfeldt v. Tongen*, 295 N.W.2d 638, 640–41 (Minn.1980)).

The plaintiff's expert medical witness, Dr. Richard Friedlander, received his medical degree from Columbia University in 1973 and completed his residency at St. Luke's/Roosevelt Hospital in New York City in 1976, following that with two years in a cardiology fellowship at the same institution. He is board certified in internal medicine and cardiology and his practical experience has included positions in private practice and those as an officer and director of medical and pharmaceutical institutions and corporations. He acknowledged during his testimonial deposition that his practice is in adult cardiology but that he does handle a "smattering of adult congenitals." He estimated that he has ordered approximately 20 lymphangiograms for his patients during his career, last directing the procedure in the late 1970s.

The trial court ruled that Dr. Friedlander disqualified himself from rendering an expert opinion on both the negligent nondisclosure and negligent treatment claims during the following exchange:

Q: (Plaintiff's counsel) Given what you have just stated, that in recent years the use of the lymphangiogram has decreased because of the development of other tests for the purposes of looking at lymph anatomy, what would be the purpose of a lymphangiogram today?

A: I think I am getting far afield of my specialty. I am not comfortable answering that question. I don't really know what the current indications would be.

The trial court concluded that the physician had disqualified himself from rendering expert opinions about an area beyond his expertise. The court considered the facts that Friedlander had had no practical experience with lymphangiograms for nearly 10 years prior to the incident, that he had not kept current on when and under what circumstances the test was indicated as of 1988 and that he had no knowledge of the standard of care. It then concluded that, "for the same reasons," Dr. Friedlander was incompetent to render expert medical testimony on the informed consent issues. In that latter regard, the trial court relied upon the witness' testimony that it was unlikely that he had ever obtained informed consent for a lymphangiogram because, "with a radiological procedure the consent is obtained by radiology."

■ We first consider the trial court's determination that the witness had disqualified himself from offering an expert opinion regarding the negligent care and treatment claim. To do so effectively, we look to the offered witness' qualifications in the context of both the nature of the illness and disease and also the purpose for which this procedure was performed. Although there can hardly be any doubt that the decedent's complex congenital heart defects underlay Vetaw's general ill health, the immediate cause of his hospitalization in October of 1988 was exudative enteropathy, a protein-losing disease of the intestine. His attending physician for purposes of evaluation and treatment of the diarrhea attendant on Vetaw's deterioration, Dr. Ulstrom, is a pediatric endocrinologist—i.e., a specialist in the diagnosis and treatment of disorders of the glands of internal secretion in children. On the other hand, Dr. Friedlander, the plaintiff's expert witness, is a cardiologist whose specialty, both by training and practice, is in the diagnosis and treatment of heart disease in adults.

Dr. Ulstrom testified that the lymphangiogram was ordered and performed in order to define the results of the disruption of the normal return of lymph caused by ligation of the thoracic duct. Had they wanted to look only at the lymph nodes, which are only a fraction of the lymphatic system, that could have been done by a noninvasive procedure such as a CAT scan or an MRI; but their concern was with the lymph vessels and the flow of lymph through those vessels. Dr. Ulstrom opined that a lymphangiogram was the only way to examine the dynamics of the entire system effectively. Dr. Friedlander's testimony simply was not focused on that diagnostic purpose.

Dr. Friedlander testified that a lymphangiogram was unnecessary for the purpose of defining lymph node anatomy because that could be accomplished by either of the two less invasive procedures and he said that he did not know of any way to repair, reroute or revise the lymph channels, but he "would defer to a surgeon" for the answer to that question. In short, Dr. Friedlander's testimony that the test was unnecessary for any purpose that he could ascertain could be viewed as a product of his self-professed lack of familiarity with the current indications for the examination under these diagnostic circumstances rather than a belief that the test was generally obsolete. At no point in his testimony did Dr. Friedlander indicate that less intrusive methods were available for viewing the dynamics of the entire lymphatic system for these diagnostic purposes. Neither did he identify the applicable standard of care or testify that these defendants had departed from that standard.

Under these circumstances, the trial court was well within the bounds of its discretion in concluding that the witness had not only disqualified himself from offering an expert opinion by his limited experience and use of the lymphangiogram procedure, but also in attempting to offer an expert opinion about an area beyond the scope of his cardiological expertise.

■ We are guided to the same conclusion with regard to the plaintiff's claims for negligent nondisclosure. Expert testimony at this stage of the proceedings is to establish a prima facie case of negligent nondisclosure by demonstrating that a risk in fact exists, that it is accepted medical practice to know of that risk and that it is more probable than not that the undisclosed risk did materialize in the harm. *See Reinhardt v. Colton, supra.* The plaintiff, similarly, must demonstrate that consent to the treatment would not have been secured if the risk was identified and disclosed. *See Cornfeldt v. Tongen,* 262 N.W.2d 684, 699 (Minn.1977).

■ Having identified the limitation on Friedlander's special expertise with regard to the case and the treatment provided, it was within the bounds of the trial court's discretion to conclude that he lacked the knowledge and experience necessary to provide expert testimony to the effect that Dr. Wadsworth should have known of an increased risk that a lymphangiogram performed on this patient would result in a pulmonary embolization leading to a later cerebral embolization. Dr. Friedlander's lack of familiarity with the current use of the lymphangiogram in 1988 as a diagnostic tool suggests that he did not have the necessary foundational expertise to offer an opinion as to the risks associated with its performance and the information Dr. Wadsworth should have provided in obtaining the requisite consent—that is, the possibility that the decedent's anatomical anomaly would act in concert with this procedure to cause injury or death.

Reversed and summary judgment reinstated.

PAGE, J., took no part in the consideration or decision of this case.