# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-2734

_____

| | | |
|---|---|---|
| Manley Stowell; Enid Stowell, | * | |
| | * | |
| Appellants, | * | |
| | * | |
| v. | * | Appeal from the United States |
| | * | District Court for the |
| Paul Huddleston, M.D.; Mayo | * | District of Minnesota. |
| Clinic-Rochester, a non-profit | * | |
| corporation, | * | |
| | * | |
| Appellees. | * | |

_____

Submitted: March 16, 2011
Filed: July 7, 2011

_____

Before SMITH, ARNOLD, and SHEPHERD, Circuit Judges.

_____

ARNOLD, Circuit Judge.

After Dr. Paul Huddleston, an orthopedic surgeon, performed spine surgery on Manley Stowell for his back pain, Mr. Stowell awoke completely blind in both eyes; the apparent cause of this loss of vision was posterior ischemic optic neuropathy (PION), a rare medical condition that results from a stroke to the optic nerves. Mr. Stowell and his wife, Enid Stowell, then brought an action under Minnesota law against Dr. Huddleston and Mayo Clinic, claiming that Dr. Huddleston, though not negligent in performing the surgery itself, had negligently failed to inform Mr. Stowell that a risk of permanent blindness accompanied the procedure. The plaintiffs sought

damages from Dr. Huddleston and Mayo for Mr. Stowell's blindness and the resulting loss of their "freedom and emotional stability."

To satisfy Minnesota's expert certification requirement for medical malpractice cases, the plaintiffs served an affidavit of Dr. Steven Robin on the defendants. *See* Minn. Stat. § 145.682, subds. 2, 4. In that affidavit, Dr. Robin averred that based on his review of Mr. Stowell's medical records, his "training and experience as an ophthalmologist," and his familiarity with the applicable standard of care, he had reached certain opinions with respect to Mr. Stowell's case to a reasonable degree of medical probability. The defendants moved for summary judgment, challenging Dr. Robin's qualifications to offer those opinions. They argued, among other things, that Dr. Robin was not qualified to testify about the appropriate standard of care because he was not an orthopedic surgeon and the plaintiffs had not shown that he had any training or experience in that medical speciality. The plaintiffs responded to the defendant's motion, in part, with an amended affidavit of Dr. Robin. In that affidavit, Dr. Robin explained that he based some of his opinions on his experience performing ophthalmologic surgeries that carried a risk of blindness that was statistically similar to the risk of PION-induced blindness in orthopedic spine surgeries. The remainder of his opinions were based on statements of Mr. Stowell's treating physicians at Mayo and some "authoritative peer reviewed" medical literature.

The district court[1] considered Dr. Robin's amended affidavit but granted summary judgment for the defendants. In coming to that decision, the court found that Dr. Robin was not qualified to offer expert opinion on the applicable standard of care and that his reliance on sources of information outside his own training and experience did not cure this lack of qualification. The court then found that without this expert testimony the plaintiffs had failed to satisfy the requirements of Minn. Stat.

---

[1]The Honorable Joan N. Ericksen, United States District Judge for the District of Minnesota.

§ 145.682, and it entered judgment on that basis. We review the district court's interpretation of state law, including § 145.682, *de novo*. *Reimer v. City of Crookston*, 326 F.3d 957, 961 (8th Cir. 2003)*; see also Bellecourt v. United States*, 994 F.2d 427, 431 (8th Cir. 1993). We review the district court's determination of an expert witness's competency for an abuse of discretion. *See General Electric v. Joiner*, 522 U.S. 136, 141-43 (1997); *see also Williams v. Wadsworth*, 503 N.W.2d 120, 123-25; *Reinhardt v. Colton*, 337 N.W.2d 88, 93 (Minn. 1983).

I.

The plaintiffs argue first that the district court abused its discretion when it determined that Dr. Robin was not qualified to provide expert testimony for the purpose of satisfying § 145.682. That statute requires a plaintiff to file two affidavits in any action against a medical care provider in which "expert testimony is necessary to establish a prima facie case": In the first affidavit, which is filed with the complaint, the plaintiff's attorney must attest to having had the case reviewed by a medical expert who concluded that the defendant breached the standard of care. Minn. Stat. § 145.682, subds. 2, 3(a). Within 180 days thereafter, the plaintiff must file a second affidavit identifying all experts who will testify on the plaintiff's behalf at trial and outlining the substance of their testimony. Minn. Stat. § 145.682, subds. 2, 4. Testimony of a witness who is not qualified to offer expert opinion cannot satisfy this disclosure requirement, *Broehm v. Mayo Clinic Rochester*, 690 N.W.2d 721, 726 (Minn. 2005), and failure to comply with the statute requires dismissal of the case with prejudice, *id.*; *see also* Minn. Stat. § 145.682, subd. 6.

The competency of a witness to provide expert medical testimony on the standard-of-care issue "depends upon both the degree of the witness' scientific knowledge and the extent of the witness' practical experience with the matter which is the subject of the offered testimony." *Reinhardt*, 337 N.W.2d at 93. Although education and professional training are important considerations, it is the "occupational experience" of a potential witness that is of "controlling importance"

when determining competency. *Cornfeldt v. Tongen*, 262 N.W.2d 684, 692 (Minn. 1977) (internal quotation marks and citations omitted). In particular, an expert witness must possess a "practical knowledge of what is usually and customarily done by physicians under circumstances similar to those which confronted the defendant." *Id.* at 692-93 (internal quotation marks and citations omitted); *see also Lundgren v. Eustermann*, 370 N.W.2d 877, 880 (Minn. 1985).

In his amended affidavit, Dr. Robin opined that "prolonged prone lumbar spine surgery," the type of surgery that Dr. Huddleston performed on Mr. Stowell, is "associated with a risk of permanent blindness." Dr. Robin also stated that prior to the date of Mr. Stowell's surgery this association had been discussed in "authoritative peer reviewed literature," which had found that between 0.2% and 0.028% of all spine surgeries resulted in permanent blindness "depending on patient and procedure risk factors." According to Dr. Robin, it was "accepted medical practice" at the time of Mr. Stowell's surgery in March, 2006, to know of this association and thus the "risk of permanent blindness from prolonged prone lumbar spine surgery." Dr. Robin also attested that the "standard of care in Minnesota" required a "reasonable physician" to inform patients of such a risk of blindness (no matter the cause) if it was associated with an elective surgical procedure and had an incidence "in the range of 0.2% and 0.028%."

The district court found that Dr. Robin was not qualified to offer any of these proposed opinions. The court stated that Dr. Robin lacked the necessary "training or experience" to testify about "the likelihood that PION would result from a prolonged prone spine surgery" or whether it was accepted medical practice for orthopedic surgeons to know of that risk. The court found for similar reasons that Dr. Robin also could not opine as to what warnings, if any, a "skilled orthopedic surgeon" would have given to a patient like Mr. Stowell under similar circumstances. In support of these findings, the court reasoned that "Dr. Robin is an eye surgeon, not a spine surgeon" and noted that nothing in Dr. Robin's amended affidavit indicated that he had

-4-

"any experience performing surgeries similar to a prolonged prone spine surgery on patients similar to Mr. Stowell under similar circumstances." The court therefore concluded that Dr. Robin's medical practice was "insufficient to establish his knowledge of or experience with what warnings are customarily given by orthopedic surgeons prior to performing prolonged prone spine surgery on a patient similar to Mr. Stowell."

After reviewing the record, we cannot say that the district court abused its discretion in finding that Dr. Robin was not qualified to testify on these matters. Even if Dr. Robin possessed a sufficient level of "scientific knowledge," *see Reinhart*, 337 N.W.2d at 93, the record is clear (and the plaintiffs admit) that Dr. Robin has absolutely no practical training or experience performing any type of orthopedic surgery. Dr. Robin similarly lacks any practical experience discussing with patients the potential risks of prolonged prone spine surgery (or any other orthopedic surgery) and obtaining their informed consent for the same. In that respect, his background is starkly different from expert witnesses in the cases the plaintiffs rely on, *see Cornfeldt*, 262 N.W.2d at 690-91; *Fiedler v. Spoelhof*, 483 N.W.2d 486, 489 (Minn. Ct. App. 1992), and *Broehm*, 690 N.W.2d at 726-27, all of whom had both sufficient knowledge and experience in the relevant subject matter to testify to the applicable standard of care despite it being outside of their respective medical specialties. Because Dr. Robin had no "practical knowledge of what is usually and customarily done" by orthopedic surgeons under circumstances similar to those that confronted Dr. Huddleston, *see Lundgren,* 370 N.W.2d at 880, he had no basis in his own experience for offering any expert opinion concerning what Dr. Huddleston should have known or done.

The district court similarly did not abuse its discretion by concluding that Dr. Robin's attempted reliance on sources of information outside his own knowledge and experience failed to cure this lack of expert witness competency. The first of these outside sources were two medical journal articles that Dr. Robin cited to in his

amended affidavit: William R. Stevens et al., *Ophthalmic Complications After Spinal Surgery*, 22 Spine 12, 1319-24 (June 15, 1997) and Shu-Hong Chang & Neil R. Miller, *The Incidence of Vision Loss due to Perioperative Ischemic Optic Neuropathy Associated With Spine Surgery, The John Hopkins Hospital Experience*, 30 Spine 11, 1299-1302 (June, 21, 2005). Dr. Robin referred to these "authoritative peer reviewed" articles for their findings that between 0.028% and 0.2% of all spine surgeries result in permanent blindness; he then used them to support his opinions that prolonged prone spine surgery is associated with permanent blindness and it was accepted medical practice to know of that risk. The district court, however, found that Dr. Robin's reliance on these articles did not alter his lack of qualifications. Central to this determination was the court's related finding that Dr. Robin had misstated the articles' respective conclusions. In particular, the court found that neither of the statistics had to do with what Dr. Robin claimed, that is, patients who had become permanently blind as a result of spinal surgery, because the statistics included patients who had become partially or only temporarily blind. And the court also noted that the statistics did not purport to state the risk of harm that Mr. Stowell had suffered, that is, PION-induced blindness in both eyes (as opposed to blindness from other causes or occurring only in one eye). Accordingly, because Dr. Robin failed to explain how the statistics were relevant to the harm that Mr. Stowell suffered, the court determined that they were insufficient to serve as the basis for his opinions.

The district court came to a similar conclusion with respect to Dr. Robin's reliance on the clinical notes of Dr. Jacqueline Leavitt, the ophthalmologist at Mayo who diagnosed Mr. Stowell with PION-induced blindness shortly after his surgery. According to her clinical notes, she explained that diagnosis to Mr. Stowell, in part, by telling him that PION was an "unfortunate event that is rarely seen" and that "anesthesiologists, orthopedists, surgeons and ophthalmologists around the country were very aware of [PION] and [had] been trying to determine risk factors to no avail." Dr. Robin incorporated these statements into his amended affidavit, noting his agreement with them. He thus apparently intended to make those opinions his

own, as well as to offer them as additional expert testimony that Dr. Huddleston should have known that prolonged prone spine surgery carried a risk of blindness, the same opinion that he sought to support with the journal articles. To the district court, however, the fact that Dr. Robin took these statements directly from another physician's clinical notes did nothing to qualify him to offer those proposed opinions. In fact, the court questioned the basis for the incorporated statements themselves since there was nothing in the record to indicate that Dr. Leavitt, also an ophthalmologist, was qualified to opine as to the standard of care for orthopedic surgeons. The court further observed that Dr. Leavitt's statements offered little support for Dr. Robin's opinions, particularly as to the likelihood that PION would result from prolonged prone spine surgery and as to whether it was accepted medical practice for orthopedic surgeons to know of and disclose that risk.

The district court did not abuse its discretion. The plaintiffs argue that Dr. Robin, as a trained physician who has himself published numerous articles and book chapters, was qualified "to locate and rely upon information published in peer reviewed medical journals." The plaintiffs also maintain that Dr. Robin was equally qualified to locate and rely upon "information contained in [Mr. Stowell's] medical records, and upon information recorded there by other physicians." We do not dispute either of these contentions. But it does not follow that Dr. Robin's ability to locate this sort of information and then use it to form opinions about this case made him competent to offer those opinions as an expert witness. That information did nothing to provide him with the sort of "practical experience" that the Minnesota Supreme Court also requires, *see Reinhardt*, 337 N.W.2d at 93, and gives "controlling importance," *Cornfeldt*, 262 N.W.2d at 692-93, when determining whether an expert witness may testify as to a standard of care. We think it plain, moreover, that even if outside information could serve as the sole basis for an expert witness's opinions, that information would have to support those opinions. As the district court noted in its decision, it is questionable whether the journal articles and clinical notes do that here.

-7-

In a final attempt to salvage Dr. Robin's proposed testimony, the plaintiffs contend that the district court erred by misconstruing the risk that, according to their complaint, needed to be disclosed in this case. The plaintiffs then argue that this error led the court to narrow the applicable standard of care improperly so that Dr. Robin, who they contend would have been qualified to offer expert opinion under a correct characterization of that risk and standard of care, was no longer able to do so. In its opinion, the district court defined the risk at issue here to be the "risk of PION" resulting from prolonged prone spine surgery; the court therefore stated that the applicable standard of care was "whether orthopedic surgeons knew of [PION] and its likelihood" and "what warnings a skilled orthopedic surgeon would have given" before performing a prolonged prone spine surgery on a patient like Mr. Stowell. The plaintiffs contend that this was error because PION is never mentioned in their complaint. They maintain that the risk that had to be disclosed in this case was the risk of permanent blindness, no matter the cause, if known by a physician to be associated with any proposed medical treatment; and the applicable standard of care, then, is whether "*any* physician, knowing that there is a risk of blindness associated with *any* proposed treatment, has a duty to disclose that risk." The plaintiffs thus maintain that Dr. Robin, as a physician who performs ophthalmologic surgeries that carry a known risk of permanent blindness, is qualified to provide expert opinion as to the standard of care in this case.

After reviewing Minnesota case law, however, we can find no other negligent nondisclosure case (or medical malpractice case, for that matter) in which the risk to be disclosed or the standard of care were defined using such generalities. The plaintiffs fail to identify such an instance in their briefs as well. Rather, they merely argue that when a court decides a medical malpractice case under Minnesota law, it must analyze it "in terms of the plaintiff's theory of the case," and they cite in support *Tousignant v. St. Louis County*, 615 N.W.2d 53, 59-60 (Minn. 2000) and *Broehm*, 690 N.W.2d at 735-36 (Anderson, J., concurring specially). But we believe that there is a fundamental difference between what these cases stand for, that is, accepting a

plaintiff's theory as to what type of medical malpractice or negligence might have occurred in a case, and what the plaintiffs seek to do here, that is, to generalize the applicable standard of care to an extent that it enables an otherwise unqualified witness to offer expert opinion. None of the cases that the plaintiffs bring to our attention supports that position, and so we reject their argument and conclude that the district court did not err by defining the risk to be disclosed and the standard of care in this case in the way that it did.

## II.

The plaintiffs argue next that, even if the district court did not err when it found that Dr. Robin was not qualified to provide expert testimony, it nevertheless did so when it granted summary judgment under §145.682, because, in the particular circumstances presented here, they did not need expert testimony "to establish a prima facie case," Minn Stat. § 145.682 subd. 2.

A cause of action for negligent nondisclosure "focuses on a doctor's duty to inform patients of the risks attendant upon certain medical procedures." *K.A.C. v. Benson*, 527 N.W.2d 553, 561 (Minn. 1995). To make out a prima facie case, then, a plaintiff must demonstrate, among other things, that the physician had a duty to disclose a particular risk of treatment. *Id.*; *see also Reinhardt*, 337 N.W.2d at 93. In establishing that a physician had a duty to disclose a risk, a plaintiff must offer evidence that the doctor "knows or should know" that the risk exists. *Kinikin v. Heupel*, 305 N.W.2d 589, 594 (Minn. 1981); *see also Cornfeldt*, 262 N.W.2d at 699. Even then, a duty to disclose arises for only certain types of risks, which the Minnesota Supreme Court has described as falling into three distinct categories: those that are of a type "which a skilled practitioner of good standing in the community would reveal"; those that present a "significant probability" of "death or serious bodily harm"; and "to the extent that a doctor is aware that a patient attaches a particular significance to risks not generally considered serious enough to require discussion," those risks as well. *Benson*, 527 N.W.2d at 561; *see also Kinikin*, 305 N.W.2d at 595.

The plaintiffs contend that even without expert testimony there was sufficient evidence in the record to establish the existence of that duty. To establish that Dr. Huddleston knew or should have known of the risk to be disclosed in this case, the plaintiffs rely upon a statement that Dr. Huddleston himself made during a deposition: He acknowledged that before he performed Mr. Stowell's procedure he had "heard" that an "association" between prolonged prone spine surgery and blindness had been reported in some "literature." They point, as well, to Dr. Leavitt's statement in her clinical notes that "anesthesiologists, orthopedists, surgeons and ophthalmologists around the country [were] very aware" of PION at the time of Mr. Stowell's diagnosis"; they argue that Dr. Leavitt's statement is an admission by Mayo establishing the same, *see* Fed. R. Evid. 801(d)(2)(D).

We doubt that either of those statements establishes that Dr. Huddleston knew or should have known of the risk in this case. But even if they did, the plaintiffs cannot make out a prima facie case without establishing that the risk was one that Dr. Huddleston had a duty to disclose, *see Benson*, 527 N.W.2d at 561, and they need expert testimony to do that.

In reaching a similar conclusion, the district court held that the plaintiffs had failed to introduce any expert testimony to prove that "a skilled practitioner of good standing would have revealed the risk" of PION-induced permanent blindness to a patient like Mr. Stowell under similar circumstances, which, as we have said, is one way in which a plaintiff may show a duty to disclose. *See id.* It also held that the plaintiffs had failed to offer the expert testimony necessary to establish "the gravity of [that] risk and the likelihood of its occurrence," in order to prove that Mr. Stowell's spinal surgery involved "a risk of death or serious bodily harm which was a significant probability"; such circumstances, too, require disclosure. *See id.; see also Cornfeldt*, 262 N.W.2d at 702. (Though we think that permanent blindness may well present an exception to the statement in *Cornfeldt* that expert testimony is necessary to establish a risk's "gravity," *id.*, we agree with the district court that a layperson cannot

-10-

determine the likelihood of the risk in this case without the assistance of a qualified expert.)

The plaintiffs argue that the court erred because it failed to consider what they term the "third prong" of the duty-to-disclose standard. The part of the Minnesota duty-to-disclose standard to which the plaintiffs refer here involves the category of risks that, although "not generally considered serious enough to require discussion," must be disclosed because a patient "attaches a particular significance" to them. *Benson*, 527 N.W.2d at 561; *see Kinikin*, 305 N.W.2d at 595. The Minnesota courts, when determining whether a risk falls within that category, have looked, at least sometimes, to objective considerations, by asking whether "a reasonable person in what the physician knows or should have known to be the plaintiff's position would consider significant when contemplating surgery." *Id.* But we don't discern anything in the record indicating that Mr. Stowell's circumstances were such that a reasonable person in his position would attach a "particular significance" to the risk of blindness that prolonged prone spine surgery presented.

Furthermore, to the extent that the Minnesota Supreme Court has suggested in its cases that a duty to disclose may also arise under this category based on the idiosyncratic, subjective concerns of a patient, there is nothing in the record to indicate that Mr. Stowell harbored any " 'peculiar or unfounded' " concerns about losing his vision, *see Benson*, 527 N.W.2d at 561 (quoting *Kinikin*, 305 N.W.2d at 595), or that Dr. Huddleston knew or should have known that he did. Mr. Stowell never questioned Dr. Huddleston about whether his surgery might cause blindness, nor did he express any anxiety or fear that such a result might occur. Even when Dr. Huddleston warned Mr. Stowell that a risk of stroke accompanied his procedure and that it could lead to a variety of problems with brain functioning, including changes in vision, Mr. Stowell never expressed any anxiety about that risk or indicated that he attached any "particular significance" to it.

-11-

In sum, there was nothing that Dr. Huddleston knew or should have known about Mr. Stowell to indicate that either a reasonable person in Mr. Stowell's position or Mr. Stowell himself would have a greater concern about the risk that he faced than an ordinary person would. We therefore conclude that the district court did not err when it failed to conclude that Dr. Huddleston had a duty to disclose the risk of PION-induced permanent blindness on that basis.

## III.

Because the district court did not err in determining that the plaintiffs failed to satisfy Minn. Stat. § 145.682, we affirm its order granting summary judgment to the defendants.

_____